UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
MICA SAINT-JEAN, <u>et al.</u>,         )
                                )
      Plaintiffs,               )
                                )
      v.                        )      Civil Action No. 08-1769 (RWR)
                                )
DISTRICT OF COLUMBIA,           )
                                )
      Defendant.                )
_____)

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Mica Saint-Jean, Guerline Bourciquot, and Marie Dorlus have brought claims against defendant District of Columbia ("D.C.") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, <u>et seq.</u>, the D.C. Whistleblower Protection Act ("WPA"), D.C. Code § 1-615.51, <u>et seq.</u>, and local statutory and common law arising from an alleged scheme which required them to pay kickbacks to their supervisor in order to receive overtime assignments.  D.C. has moved to dismiss those claims.[1]  Because the plaintiffs' FLSA and WPA claims are sufficiently pled and not foreclosed by the unclean hands doctrine, the motion to dismiss will be denied as to those claims.  The motion will be granted as to the plaintiffs' *quantum meruit* claim because it was based upon

_____

[1] D.C. unsuccessfully challenged claims plaintiffs have brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u>  <u>See</u> <u>Saint-Jean v. D.C.</u>, Civil Action No. 08-1769 (RWR), 2012 WL 547814 (D.D.C. Feb. 21, 2012).

-2-

an illegal arrangement, and as to their unexhausted defamation claim which, in any event, fails to state a claim for relief.

BACKGROUND

The plaintiffs allege the following facts, many of which are set forth in Saint-Jean v. D.C. ("Saint-Jean II"), Civil Action No. 08-1769 (RWR), 2012 WL 547814, at *1-*2 (D.D.C. Feb. 21, 2012). The plaintiffs, all Haitian immigrants, worked at a school bus terminal of the D.C. Public Schools Division of Transportation ("DOT"). They were denied the opportunity to work overtime hours unless they paid illegal kickbacks to their former supervisor, Michelle Smith, the Terminal Manager. (2d Am. Compl. ¶¶ 2, 13-15, 24, 192.) Saint-Jean and Dorlus each paid Smith between $75 and $150 per pay period to obtain overtime assignments.[2] (2d Am. Compl. ¶¶ 30, 34-35.) When they stopped paying Smith in September of 2007, Smith retaliated by refusing to assign them overtime hours, selectively enforcing DOT policies against them, "issuing repeated and unnecessary warnings[,]" and suspending Bourciquot without pay. (2d Am. Compl. ¶¶ 5, 45-47, 57, 62-63, 193.)

A group of Haitian DOT employees discussed Smith's scheme with DOT's Transportation Administrator, David Gilmore, in

---

[2] Saint-Jean began paying kickbacks to Smith in June of 2004. (2d Am. Compl. ¶ 30.) Dorlus began paying Smith kickbacks in December of 2005. (Id. ¶ 34.)

October of 2006.  As a result, Smith was suspended for six weeks.
Smith resumed her scheme after she returned.  (2d Am. Compl.
¶¶ 4, 38-42).  In November or December of 2007, Saint-Jean and
Dorlus reported Smith's illegal kickback scheme and retaliation
to the Mayor's office, the Office of the Inspector General
("OIG"), the Office of the Attorney General ("OAG"), and the FBI.
(Id. ¶ 6.)  Bourciquot disclosed the scheme to DOT Assistant
Manager Janice Waters in March of 2008.[3]  (Id. ¶ 56.)  Between
July 10 and 16, 2008, "Hastings-Carey" and "Washington" issued
four written warnings and a written reprimand to each of Saint-
Jean and Bourciquot for allegedly refusing a directive and
padding the clock.  (Id. ¶¶ 64-65, 184-85.)

The plaintiffs discussed some of Smith's discrimination
against Haitians with Gilmore on July 17, 2008.  (2d Am. Compl.
¶ 77.)  The following day, Saint-Jean told Gilmore that Smith
accepted bribes in exchange for paying employees for hours not
worked, and that Smith let her boyfriend use DOT buses for
personal purposes.  (2d Am. Compl. ¶¶ 79, 82.)  DOT Deputy
Terminal Manager Michael Roberts suspended Bourciquot and Dorlus
without pay on July 21, 2008, for five days, for an alleged
failure to "call to report they would be late [to work] on July

---

[3] It was "one week after Bourciquot informed Waters of
Smith's unlawful kickback scheme [that] Smith suspended
Bourciquot from March 24 [through] 26, 2008, without pay, citing
unspecified 'time padding.'"  (2d Am. Compl. ¶ 57.)

-4-

18th" (id. ¶¶ 86-87), and directed a security guard to escort

them off DOT property later that afternoon.  (Id. ¶ 183.)  On

July 29, 2008, DOT notified Bourciquot and Dorlus of their

"proposed termination[s]" for insubordination to an immediate

supervisor.  (Id. ¶¶ 97, 99.)  Their effective date of

termination was August 14, 2008.  (2d Am. Compl. ¶ 100.)  DOT

placed Saint-Jean on a ten-day administrative leave for

insubordination on September 10, 2008, with notice that she would

be terminated effective September 24, 2008.  (2d Am. Compl.

¶¶ 114-115.)

The defendant has moved in part to dismiss the plaintiffs'

claims under the FLSA and the WPA and for defamation and *quantum*

*meruit* relief for failure to state claims upon which relief can

be granted.  The plaintiffs oppose the motion.

## DISCUSSION

The Federal Rules of Civil Procedure provide for "extremely

liberal" pleading standards.  Vila v. Inter-Am. Inv., Corp., 570

F.3d 274, 291 (D.C. Cir. 2009).  Under Rule 8(a)(2), a complaint

need only contain "'a short and plain statement of the claim'"

giving "'the defendant fair notice of what the . . . claim is and

the grounds upon which it rests'" and "'showing that the pleader

is entitled to relief.'"  Bell Atl. Corp. v. Twombly, 550 U.S.

544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

(1957).  "[D]etailed factual allegations" are likewise

-5-

unnecessary under Rule 12(b)(6), <u>id.</u>, which authorizes dismissing a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  <u>Ivey v. Fenty</u>, 65, 67-68 (quoting <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009)) (citation omitted).  Facially plausible claims permit "the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 129 S. Ct. at 1949.  "Th[is] plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>

In considering a Rule 12(b)(6) motion to dismiss, a court "assume[s] all the allegations in the complaint are true (even if doubtful in fact)" and "must give the plaintiff[s] the benefit of all reasonable inferences derived from the facts alleged." <u>Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.</u>, 525 F.3d 8, 17 (D.C. Cir. 2008) (internal quotation marks and citation omitted); <u>accord</u> <u>Simba v. Fenty</u>, 754 F. Supp. 2d 19, 22 (D.D.C. 2010).  However, "'the court need not accept [unsupported] inferences[,] . . . [nor must it] accept legal conclusions cast in the form of factual allegations.'"  <u>Vila</u>, 570 F.3d at 291 (quoting <u>Kowal v. MCI Communic'ns Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  Any "labels and conclusions," "naked assertion[s],"

-6-

and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," will not suffice to avoid dismissal.  Iqbal, 129 S. Ct. at 1949; Mekuria v. Bank of Am., Civil Action No. 10-1325 (JEB), 2011 WL 4430868, at *3 (D.D.C. Sept. 23, 2011).

I.   FLSA

"'The central aim of the [FLSA] was to achieve, in those industries within its scope, certain minimum labor standards.'" McMaster v. State of Minn., 30 F.3d 976, 980 (8th Cir. 1994) (quoting Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 292 (1960)).  It was enacted to support the "'minimum standard of living necessary for health, efficiency, and general well-being of workers[,]'" and "to prevent unfair competition resulting from the use of underpaid labor."  Id. (quoting 29 U.S.C. § 202(a)) (citation omitted).

A.   Overtime provision

"The FLSA provides affected employees with a cause of action to recover for violation of its overtime provision," Figueroa v. D.C. Metro. Police Dep't, 633 F.3d 1129, 1132 (D.C. Cir. 2011) (citing 29 U.S.C. § 216(b)), "which ordinarily requires employers[4] to pay employees time-and-one-half for hours worked beyond forty per week[.]"  Saint-Jean v. D.C. Pub. Sch. Div. of

---

[4] The parties do not dispute that DOT is an employer within the meaning of the FLSA.  The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).

Transp. ("Saint-Jean I"), Civil Action No. 08-1769 (RWR), 2011 WL
4552982, at *2 (D.D.C. Mar. 31, 2011) (quoting Smith v. Gov't
Emp. Ins. Co., 590 F.3d 886, 888 (D.C. Cir. 2010)).  D.C. argues
that the plaintiffs' claim for overtime payments under FLSA fails
because it is time-barred, because Smith acted outside the scope
of her employment while orchestrating the illegal scheme, because
DOT paid plaintiffs "free and clear" for any and all overtime
hours, and because the plaintiffs were willing and voluntary
participants in Smith's cash-for-overtime arrangement.  (Def.'s
Mot. [Dkt. #23] to Dismiss Pls.' Compl. ("Def's Mot. [Dkt. #23]")
at 10-14; Def.'s Mot. [Dkt. #37-1] to Dismiss Pls.' Am. Compl. or
for Summ. J. ("Def.'s Mot. [Dkt. #37-1]") at 14-19.)

     The plaintiffs counter that they were not paid "free and
clear" for their overtime hours since they were compelled to pay
Smith kickbacks, that DOT's FLSA violation was willful, and that
their participation in the scheme does not bar relief.  (Pls.'
Mem. in Opp'n to Def.'s Mot. to Dismiss Pls.' Compl. ("Pls.'
Opp'n") at 16-21.)  They allege that while they worked for more
than 40 hours per week, Smith, DOT's agent, reduced their wages
by requiring them to pay kickbacks.  (2d Am. Compl. ¶¶ 2, 29, 31,
156.)  For example, Saint-Jean and Dorlus paid Smith as much as
$150 per pay period in order to obtain overtime work.  (Id. ¶¶ 2,
30, 32, 34-35.)  The plaintiffs claim that DOT was aware of

-8-

Smith's kickback scheme but repeatedly failed to take corrective action against her.  (Id. ¶¶ 156-57.)

     1.   Time bar

For actions against employers, the FLSA provides statute of limitations periods of two years for non-willful violations and three years for willful violations.  Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 357 (4th Cir. 2011) (citing 29 U.S.C. § 255(a)).  Plaintiffs bear the burden to make a "factual showing" of willfulness, Clarke v. JPMorgan Chase Bank, N.A., No. 08 Civ. 2400, 2010 WL 1379778, at *10 (S.D.N.Y. Mar. 26, 2010), which the Supreme Court has described as an employer's "either [knowing] or . . . reckless disregard for the matter of whether its conduct was [statutorily] prohibited."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).  "Reckless disregard . . . involves actual knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation."  Clarke, 2010 WL 1379778, at *10 (internal quotation marks and citation omitted).  Neither mere negligence nor a merely unreasonable determination of the employer's obligations under the FLSA suffice to show willfulness.  Id.

"[J]udicial experience and common sense[]" nudge the allegations of DOT's reckless disregard for FLSA's requirements "across the line from conceivable to plausible."  Iqbal, 129 S. Ct. at 1950, 1951 (internal quotation marks and citations

omitted).  D.C. does not dispute that it knew of its legal obligation to pay overtime wages undiminished by extorted kickbacks.  See Teoba v. Trugreen Landcare, LLC, 769 F. Supp. 2d 175, 184 (W.D.N.Y. 2011) (stating that "FLSA's anti-kickback regulation holds that any money an employee 'kicks back directly or indirectly to the employer or another person for the employer's benefit' must be excluded from calculating the employee's actual wages.") (citing 29 C.F.R. § 531.35) (additional quotation marks and citation omitted).  The plaintiffs have pled that Gilmore became aware of Smith's kickback scheme in 2006.  (2d Am. Compl. ¶ 4.)  After DOT suspended Smith for six weeks because of the scheme, it nevertheless reinstated her and restored her responsibility for assigning overtime hours.  (Id. ¶¶ 40, 42.)  She resumed the scheme, and employees "increased the amount of their kickbacks to Smith [upon her return] and . . . [were] rewarded with more overtime."  (Id. ¶¶ 4, 42.)  These facts adequately allege that DOT deliberately disregarded the risk of recurring FLSA violations by re-appointing Smith to the same position with the same responsibilities, and failing to monitor the kickback scheme's resurgence.  (See Pls.' Opp'n at 20.)  Accordingly, the three-year statute of limitations applies.  See 29 U.S.C.

-10-

§ 255(a).  The plaintiffs may challenge any alleged FLSA

violations occurring after October 16, 2005 -- the date three

years before the plaintiffs filed this action.[5]

     2.   Agency relationship

D.C. argues that DOT did not violate the FLSA since Smith

acted outside the scope of her employment by orchestrating the

kickback scheme.  (Def.'s Mot. [Dkt. #23] at 13-14; Def.'s Mot.

[37-1] at 17.)  The plaintiffs respond that Smith's malfeasance

is attributable to D.C.  (Pls.' Opp'n at 6-8.)

"Agency is the fiduciary relationship that arises when . . .

a 'principal' manifests assent to . . . an 'agent['] that the

agent shall act on the principal's behalf and subject to the

principal's control, and the agent manifests assent or otherwise

consents so to act."  Restatement (Third) of Agency § 1.01

(2006).[6]  As a principal, "[a]n employer is subject to liability

for torts committed by [agent] employees while acting within the

scope of their employment."  Id. § 2.04.  D.C. law governs the

question of vicarious liability.  Sharma v. D.C., 791 F. Supp. 2d

---

[5] Any FLSA claim arising from payments Saint-Jean made to
Smith between June of 2004 and October 16, 2005, and those Dorlus
made to Smith before October 16, 2005, are therefore time-barred.
(2d Am. Compl. ¶ 30.)

[6] "In 2006 the Restatement (Second) of Agency was superseded
by the Restatement (Third) of Agency, which uses 'employer' and
'employee' rather than 'master' and 'servant[.]'"  Schmidt v.
Burlington N. and Santa Fe Ry. Co., 605 F.3d 686, 690 n.3 (9th
Cir. 2010) (citation omitted).

207, 212 (D.D.C. 2011) ("It is well-settled that on issues of

District of Columbia law this Court defers to the decisions of

the local D.C. courts."). The D.C. Circuit recently stated that

the scope-of-employment test, which "D.C. [caselaw] appl[ies]

. . . very expansively," "often is akin to asking whether the

defendant merely was on duty or on the job when committing the"

challenged conduct. Harbury v. Hayden, 522 F.3d 413, 422 n.4

(D.C. Cir. 2008). "[S]everal D.C. cases hold[] that seriously

criminal and violent conduct can still fall within the scope of a

defendant's employment . . . -- including sexual harassment, a

shooting, armed assault, and rape." Id. at 422.[7] Accordingly,

in identifying conduct within the scope of a defendant's

employment, a court may consider whether the challenged conduct

"w[as] incidental to the defendant['s] legitimate employment

duties" or "foreseeable as a direct outgrowth of [her]

---

[7] Under D.C. caselaw, a "university dean [was deemed to
have] acted within [the] scope of employment in sexually
harassing [a] faculty member during [faculty] meetings[,]" a
"laundromat employee acted within [the] scope of employment in
shooting [a] customer during [a] dispute over removing clothes
from [a] washing machine[,]" and a "mattress deliveryman acted
within [the] scope of employment in raping [a] customer after [a]
dispute arose during delivery." Harbury, 522 F.3d at 422
(collecting cases); see also Kalil v. Johanns, 407 F. Supp. 2d
94, 98 n.3 (D.D.C. 2005) (citing Brown v. Argenbright Sec., Inc.,
782 A.2d 752, 758 (D.C. 2001) (holding that a reasonable jury
could determine a security guard's perpetration of an alleged
assault occurred within the scope of employment because it began
with a physical search of a suspected shoplifter)).

-12-

responsibility" and "undertaken on [the employer's] behalf."[8]
Id. at 422.

Here, the plaintiffs sufficiently have pled facts reflecting
that Smith's conduct was incidental to her legitimate
responsibility to assign overtime hours and foreseeable as a
direct outgrowth of that responsibility -- certainly after
Gilmore became aware of the scheme in October of 2006.  Id.  (See
2d Am. Compl. ¶¶ 17, 22, 24, 38.)  The complaint articulates that
Smith's "scheme was designed to extract money[]" rather than to
benefit DOT.  (Id. ¶ 37.)  The process Smith followed for
assigning overtime hours, corrupted as it was by kickback
requirements, can fairly be said to have been undertaken

---

[8] Courts in this circuit also have applied the common law
agency test articulated in the Second Restatement of Agency.
See, e.g., Kalil v. Johanns, 407 F. Supp. 2d 94, 97 (D.D.C.
2005).

> [C]onduct of a servant is within the scope of
> employment if, but only if: [a] it is of the kind he is
> employed to perform; [b] it occurs substantially within
> the authorized time and space limits; [c] it is
> actuated, at least in part, by a purpose to serve the
> master; and [d] if force is intentionally used by the
> servant against another, the use of force is not
> unexpectable by the master.

Id. (quoting Restatement (Second) of Agency § 228(1).)  Smith was
authorized to assign overtime hours and did so "within the
authorized time and space limits" of the job.  See id.  (2d Am.
Compl. ¶¶ 22, 24.)  Smith's "supervisory decision" to assign
overtime hours in a discriminatory manner "should be considered
'actuated, at least in part, by a purpose to serve the master'"
in light of D.C.'s "expansive view of the scope of employment."
Id. at 98 (citation omitted).

-13-

nonetheless on DOT's behalf and to serve DOT.[9]  Thus, the

complaint amply pleads that Smith's scheme was executed within

the scope of her employment and that her actions are attributable

to DOT.

3.   Free and clear

D.C. argues that DOT paid the plaintiffs in full for their

overtime work and should not be held responsible for the

plaintiffs' "voluntary" decision to spend their paychecks on

kickbacks.  (Def.'s Mot. [Dkt. #23] at 10-11; Def.'s Mot. [Dkt.

#37-1] at 14, 16.)  "Under the FLSA any money that the employee

'"kicks back" directly or indirectly to the employer or another

person for the employer's benefit' must be excluded from

calculation of the employee's actual wages."  Yu G. Ke v. Saigon

Grill, Inc., 595 F. Supp. 2d 240, 257 (S.D.N.Y. 2008) (citing 29

C.F.R. § 531.35).  Wages must be "'paid finally and

unconditionally or "free and clear"'" on payday, Cumbie v. Woody

Woo, Inc., 596 F.3d 577, 581 (9th Cir. 2010) (quoting 29 C.F.R.

§ 531.35), since the FLSA "prevents improper deductions [which]

reduc[e] the wages of a worker below the minimum wage[.]"

Arriaga v. Fla. Pacific Farms, L.L.C., 305 F.3d 1228, 1241 (11th

Cir. 2002).  "[Allowing] employers to frustrate the policy of

_____

[9] See also Pls.' Opp'n at 7 (describing the third element of
the common law agency test as requiring that the conduct in
question be "performed, at least in part, to serve the employer")
(quoting Restatement (Second) of Agency § 228 (1958)).

-14-

. . . the FLSA through the use of kickbacks" is disfavored.

Donovan v. Crisostomo, 689 F.2d 869, 876 (9th Cir. 1982).

Plaintiffs claim facts here like those in Yu G. Ke, where "cash payments  . . . were demanded of plaintiffs for the benefit of the defendants, that is, to ensure that a sufficient amount of [overtime] work was accomplished by [DOT] staff." Yu G. Ke, 595 F. Supp. 2d at 257. (See Pls.' Opp'n at 18.) The plaintiffs have adequately alleged that the kickback payments here rise to the level of a FLSA violation in light of Smith's coercive behavior. (2d Am. Compl. ¶¶ 24, 45-47.)

4. Unclean hands

D.C. argues that equity bars relief under the FLSA since the plaintiffs paid illegal kickbacks and were complicit in Smith's scheme. (Def.'s Mot. [Dkt. #23] at 12-14; Def's Mot. [Dkt. #37-1] at 16-17.) The plaintiffs counter that their actions did "not run afoul of the FLSA." (Pls.' Opp'n at 20.)

"[C]ourts have discretion to deny equitable relief to a party who has not acted fairly and without fraud or deceit as to the controversy at issue." Armenian Genocide Museum and Memorial, Inc. v. Cafesjian Family Found., Inc., 691 F. Supp. 2d 132, 159 (D.D.C. 2010) (quotation marks and citation omitted). Thus, the equitable doctrine of unclean hands can apply "where there is misconduct by the plaintiff in the same transaction that is the subject of h[er] claim.'" Harrington v. Trotman, 983 A.2d

342, 348 (D.C. 2009) (quoting <u>Int'l Tours & Travel, Inc. v.</u>
<u>Khalil</u>, 491 A.2d 1149, 1155 (D.C. 1985)).

D.C. bears the burden of showing that "unclean hands bars
equitable relief[.]" <u>Pedinol Pharmacal, Inc. v. Rising Pharm.,</u>
<u>Inc.</u>, 570 F. Supp. 2d 498, 505 (E.D.N.Y. 2008). "That burden is
satisfied by a showing of 'truly unconscionable and brazen
behavior.'" <u>Id.</u> (citation omitted); <u>see also</u> <u>Cochran v. Burdick</u>,
89 F.2d 831, 834 (D.C. Cir. 1937) (citing fraudulent or
unconscionable behavior as conduct constituting unclean hands).
In determining whether a plaintiff's own misbehavior operates to
bar recovery, "equity does not demand that its suitors shall have
led blameless lives[.]" <u>Ellipso, Inc. v. Mann</u>, Civil Action No.
05-1186 (RCL), 2006 WL 1126814, at *2 (D.D.C. Apr. 27, 2006).
"[T]he doctrine may be relaxed if defendant has been guilty of
misconduct that is more unconscionable than that committed by
plaintiff[,]" <u>Duggal v. Krishna</u>, 554 F. Supp. 1043, 1047 (D.D.C.
1983) (internal quotation marks and citation omitted); <u>see</u> 11A
Wright, Miller, Kane and Marcus, Federal Practice and Procedure
§ 2946 (2d ed. 2011), or if the party invoking the doctrine was
"the principal actor in the perpetration of the fraud[.]"
<u>Cochran</u>, 89 F.2d at 834. The plaintiffs were subordinate in
power to Smith who plaintiffs allege was the principal actor in
perpetrating the illegal scheme. Plaintiffs' capitulation to a
superior's extortionate demand, if it is unconscionable, is far

-16-

less so than the superior's making the demand.  The plaintiffs'
efforts reflect less "fraud or deceit" than they reflect an
effort to obtain overtime assignments which they were rightfully
entitled to seek.[10]  <u>Baker v. David A. Dorfman, P.L.L.C.</u>, No. 99
CIV. 9385 DLC, 2000 WL 297160, at *3 (S.D.N.Y. Mar. 22, 2000).
Equity therefore does not bar the plaintiffs' FLSA claim under
FLSA's overtime provision, and it will survive dismissal.

   B.   <u>Retaliation</u>

   D.C. argues that the plaintiffs have failed to plead a prima
facie case for retaliation under the FLSA, in part because "only
Bourciquot and Dorlus are alleged to have suffered adverse
action."  (Def.'s Mot. [Dkt. #37-1] at 19.)  "The
anti-retaliation provision of the FLSA [makes it] unlawful to
'discharge or in any other manner discriminate against any
employee because such employee has filed any complaint or
instituted or caused to be instituted any proceeding under or
related to this chapter.'"  <u>Arencibia v. 2401 Restaurant Corp.</u>,
Civil Action No. 09-165 (CKK), 2011 WL 6396538, at *16 (D.D.C.
Dec. 21, 2011) (quoting 29 U.S.C. § 215(a)(3)).  "[I]n order to
establish a prima facie case of retaliation under the FLSA, a
plaintiff must demonstrate (1) that the employer was aware that
plaintiff was engaged in statutorily protected activity, (2) that

_____

   [10] D.C. offers no support for the proposition, for example,
that the plaintiffs "*knew* they were not supposed to work
overtime."  (Def.'s Mot. [Dkt. #23] at 13 (emphasis added).)

the employer took adverse action against the plaintiff, and (3) that there was a causal relationship between the two." Cooke v. Rosenker, 601 F. Supp. 2d 64, 72 (D.D.C. 2009) (citations omitted).

According to the plaintiffs, DOT was aware that they were disclosing the scheme both internally and to local and federal investigative authorities. (2d Am. Compl. ¶¶ 6, 8, 56, 77.) The plaintiffs allege that, soon thereafter, DOT took adverse employment action against them by "suspending their employment, reprimanding them, harassing them and ultimately terminating their employment" (id. ¶ 162). Drawing all reasonable inferences in the plaintiffs' favor, the close temporal proximity of the protected behavior and the alleged retaliation can suggest that "there was a causal relationship between the two." Cooke, 601 F. Supp. 2d at 72, 79. No more is necessary to survive Rule 12(b)(6) dismissal.

The D.C. Circuit has not yet determined whether mere informal complaints can trigger protection from retaliation under the FLSA. Miller v. Health Servs. for Children Found., 630 F. Supp. 2d 44, 49 (D.D.C. 2009) (citing Cooke, 601 F. Supp. 2d at 74-75 (collecting cases)). "[E]ven assuming that retaliation for making an informal complaint is cognizable under § 215(a)(3), an 'employee must [still] step outside his or her role of representing the company and . . . threaten to file [] an action

-18-

adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.'" Id. at 50 (quoting Hicks v. Ass'n of Am. Med. Coll., 503 F. Supp. 2d 48, 52-53 (D.D.C. 2007)). The plaintiffs initiated meetings to disclose Smith's fraud to the Mayor's Office, the OIG, the OAG, and the FBI; they also took the initiative to file complaints with the EEOC. (2d Am. Compl. ¶¶ 6, 48-55.) Under these circumstances, they have amply pled that they "step[ped] outside [their] role[s]" as DOT representatives and "engaged in activities" reasonably perceived as directed toward the protection of their FLSA rights. Miller, 630 F. Supp. 2d at 49. The FLSA retaliation claim will proceed.

II. DCWPA

The plaintiffs allegedly made multiple disclosures regarding Smith's scheme to local and federal authorities. (2d Am. Compl. ¶ 169.) In late 2007, they complained orally to the OAG, the OIG, the Mayor's Office and the FBI. (Id. ¶¶ 6, 48-49.) They complained internally to Gilmore and Waters in March and July of 2008, respectively. (Id. ¶¶ 4, 56, 77, 79, 82.) Finally, on September 17, 2008, all three plaintiffs filed written complaints with the EEOC. (Id. ¶¶ 105, 118.) They allege that these complaints constituted protected disclosures under the WPA and prompted DOT to take prohibited personnel actions against them,

including suspending, reprimanding, and terminating them, and
rescinding their offers of reinstatement.  (Id. ¶¶ 170-171.)
D.C. argues that the plaintiffs have failed to plead a prima
facie case under the WPA or, alternatively, that the claim is
barred by the doctrine of "unclean hands."  (Def.'s Mot. [Dkt.
#23] at 4-10; Def.'s Mot. [Dkt. #37-1] at 7-13.)

The WPA's central "premise . . . is that District employees
can function as the 'eyes and ears' of District taxpayers."
Williams v. D.C., 9 A.3d 484, 490 (D.C. 2010) (citation omitted).
Accordingly, the Act "encourage[s] [D.C.] employees to 'report
waste, fraud, abuse of authority, violations of law, or threats
to public health or safety' by protecting such employees from the
'retaliation or reprisal' they could otherwise face for bringing
these government excesses to light."  Hawkins v. Boone, 786 F.
Supp. 2d 328, 332 (D.D.C. 2011) (quoting D.C. Code § 1-615.51).
To plead a prima facie case under the WPA, "a plaintiff must
allege that 1) she made a protected disclosure,[11] 2) her employer

_____

[11] One 2010 amendment to the WPA revised the definition of
"'protected disclosure' so that the term explicitly includes 'any
disclosure of information . . . without restriction to . . .
prior disclosure made to any person by an employee or
applicant[.]"  Williams v. D.C., 9 A.3d at 490 n.5.  Though the
amendment may not apply retroactively since it "attaches new
legal consequences to events completed before its enactment,"
Bowyer v. D.C., 779 F. Supp. 2d 159, 164 (D.D.C. 2011), it
nonetheless "reflects the D.C. Council's focus on protecting
employees . . . who risk their job security to disclose
information that might have *already been disclosed* by another
employee or applicant[.]"  Id. (emphasis added); compare also id.
at 489 ("a government employee may be protected by the WPA even

-20-

or supervisor retaliated by taking, or threatening to take, prohibited personnel actions against her, and 3) her protected disclosure was a contributing factor to the prohibited employment action." <u>Byrd v. D.C.</u>, 807 F. Supp. 2d 37, 73 (D.D.C. 2011).

An employee making a protected disclosure must reveal agency errors so serious that reasonable people would not debate whether the agency erred. <u>Mentzer v. Lanier</u>, 677 F. Supp. 2d 242, 250 (D.D.C. 2010). When the plaintiffs filed this action, the WPA defined a protected disclosure as

> any disclosure of information . . . by an employee to a supervisor or a public body that *the employee reasonably believes* evidences: (A) Gross mismanagement; (B) Gross misuse or waste of public resources or funds; (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract; (D) A violation of federal, state, or local law ... which is not of a merely technical or minimal nature; or (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6) (2001) (emphasis added). "The . . . inquiry . . . [is] not whether the conduct was in fact ultimately found to be illegal or a gross abuse[.]" <u>Williams v. Johnson</u>, 701 F. Supp. 2d 1, 14-15 (D.D.C. 2010). Instead, an individual's reasonable belief turns on whether "'a disinterested observer with knowledge of the essential facts known to and

---

if [s]he disclosed information previously known by at least some members of the public.") <u>with</u> <u>id.</u> (holding that previous disclosures bar WPA protection for subsequent disclosures which involved "not only public knowledge but also vocalized public concern about the very information that [the whistleblower] conveyed.")

-21-

readily ascertainable by the employee [could] reasonably conclude

that the actions of the government evidence [illegality, gross

abuse, etc.].'" <u>Id.</u> (quoting <u>Zirkle v. D.C.</u>, 830 A.2d 1250,

1259-60 (D.C. 2003)) (alteration in original).

Prohibited personnel actions within the meaning of the WPA

include

> recommended, threatened, or actual termination,
> demotion, suspension, or reprimand; involuntary
> transfer, reassignment, or detail; referral for
> psychiatric or psychological counseling; failure to
> promote or hire or take other favorable personnel
> action; or retaliating in any other manner against an
> employee because that employee makes a protected
> disclosure or refuses to comply with an illegal
> order[.]

D.C. Code § 1-615.52(a)(5)(A).

A.   <u>Prima facie case</u>

1.   Protected disclosure

The defendant argues that the plaintiffs made no disclosure

at all because other Haitian bus drivers had revealed the scheme

to Gilmore as early as October of 2006.  (Def.'s Mot. [Dkt. #23]

at 8; 2d Am. Compl. ¶¶ 4, 38.)  The plaintiffs counter that they

can state a claim "without pleading that they were the first to

disclose Smith's conduct."[12]  (Pls.' Opp'n at 9.)  Neither the

_____

[12] Plaintiffs inaccurately cite <u>Tabb v. D.C.</u>, 605 F. Supp.
2d (D.D.C. 2009), as holding that "a plaintiff's disclosure was
protected even though[] it was already widely known in the
agency."  (Pls.' Surreply at 5.)  In <u>Tabb</u>, the defendant disputed
that the plaintiff's disclosures warranted protection since she
stated that her disclosure "was a well known fact."  <u>Id.</u> at 98.
Noting that the statement "was not under oath, . . . appears

text of the WPA nor the cases interpreting it require that "no
one . . . [be] aware of the [alleged] abuse[]" before disclosure.
Williams v. D.C., 9 A.3d at 489.  Instead, under D.C. caselaw, "a
plaintiff's statements do not qualify as 'protected disclosures'
under the WPA if the statements conveyed *only* information that
was already known to the person to whom the information is
reported[.]"  Williams v. Johnson, 701 F. Supp. 2d at 15
(citation omitted) (emphasis added).  The D.C. Court of Appeals
also has excluded from protection disclosures that merely
"relay[] . . . public complaints" where "members of the public
. . . themselves perceived an alleged abuse, and already
vociferously and repeatedly dr[ew] attention to it[.]"  Williams
v. D.C., 9 A.3d at 490.

Other than certain complaints made to Gilmore, the
plaintiffs' oral and written statements regarding Smith appear to
meet the statutory definition of protected disclosures.  See D.C.
Code § 1-615.52(a)(6).  The plaintiffs' statements to Gilmore
about Smith's discriminatory treatment of Haitians and her
kickback scheme do not warrant WPA protection since he already
was aware of those fraudulent activities.  (2d Am. Compl. ¶¶ 4,
7, 38.)  See also Williams v. Johnson, 701 F. Supp. 2d at 15.

_____

likely to have been hyperbole[,]" and that the plaintiff later
stated that it was "hard to say who all knew[]" the subject of
her disclosure, the court concluded that whether the plaintiff's
statements were protected disclosures constituted a "genuine
issue[] of material fact."  Id.

-23-

However, just as no pleading suggests that the Mayor's office or Waters knew of Smith's scheme before Saint-Jean and Dorlus disclosed it to them in November of 2007 and March of 2008, respectively (2d Am. Compl. ¶ 48; see also id. ¶ 56), Gilmore allegedly did not previously know that Smith accepted bribes in exchange for paychecks and allowed her boyfriend to use DOT buses for personal purposes.  (Id. ¶ 82.)  The plaintiffs likewise have not alleged that D.C. retaliated against them after they relayed already "public complaints about a perceived abuse" -- circumstances which "may well merit reproach, but . . . do[] not appear to be the particular evil at which the DC-WPA was aimed." Williams v. D.C., 9 A.3d 484 at 490 n.5.

"'[A] disinterested observer with knowledge of the essential facts known to and readily ascertainable by the [plaintiffs] [could] reasonably conclude that" Smith's and DOT's actions evidenced illegality -- that is, the agency's violation of federal employment discrimination laws.  Williams v. Johnson, 701 F. Supp. 2d at 14; see also D.C. Code § 1-615.52(a)(6)(D). Because the plaintiffs pled a reasonable belief that Smith grossly mismanaged and abused her authority, and violated employment discrimination laws, they have asserted disclosures that were protected disclosures within the meaning of the WPA. See D.C. Code § 1-615.52(a)(6)(A), (C).

-24-

    2.   Causality

The plaintiffs allege that D.C.'s prohibited personnel actions against them included "suspension, reprimands, recommended, threatened and actual terminations" (2d Am. Compl. ¶ 170.)  D.C. argues that the plaintiffs' protected disclosures were not a "contributing factor" in causing the plaintiffs' suspensions without pay and terminations.  (Def.'s Mot. [Dkt. #23] at 9-11.)  The plaintiffs allege close temporal proximity between their protected disclosures and the defendant's prohibited personnel actions.  (2d Am. Compl. ¶¶ 85-86, 170-71.)

The plaintiffs must "demonstrate as part of [their] prima facie case that the protected disclosure was a contributing factor to the allegedly retaliatory actions . . . i.e., that Defendants would not have taken the allegedly retaliatory actions but for her protected disclosures."  Williams v. Johnson, 701 F. Supp. 2d  at 17 (internal quotation marks and citation omitted).  Under D.C. caselaw, close temporal proximity may suffice to establish causality.  Johnson v. D.C., 935 A.2d 1113, 1120 (D.C. 2007) (stating that "four months realistically cannot constitute temporal proximity in the ordinary sense of that phrase.")  Here, the plaintiffs have alleged that they suffered adverse employment actions within days and weeks after reporting Smith's scheme. (2d Am. Compl. ¶¶ 86-87, 50, 183.)  They have therefore pled a prima facie case under the WPA.

-25-

B.   Unclean hands

D.C. argues that the affirmative defense of unclean hands bars the plaintiffs' WPA claim given their complicity in Smith's scheme. (Def.'s Mot. [Dkt. #23] at 8-10.)  D.C. also argues that granting relief would undermine the policies underlying the WPA, which was "enacted to motivate employees to do their duties justly and efficiently." (Id. at 9 (quotation marks and citation omitted) (emphasis removed).)  As is stated above, D.C. has not met its burden to show that the plaintiffs' conduct was truly "unconscionable" or "brazen." See Pedinol, 570 F. Supp. 2d at 505; Cochran, 89 F.2d at 834.  Allowing this claim to proceed would actually promote the policies underlying the WPA by testing the merits of the plaintiffs' whistleblowing efforts.

III. QUANTUM MERUIT

D.C. argues that the plaintiffs' *quantum meruit* claim[13] is barred because 1) they were compensated for their overtime work and 2) the services they performed were based on an illegal arrangement. (Def.'s Mot. [Dkt. #23] at 14-15.)  The plaintiffs counter that Smith's misconduct is attributable to DOT, which was

---

[13] D.C. appears to conflate claims for *quantum meruit*, which concerns implied contract claims in fact, and unjust enrichment, which applies to implied contract claims in law.  Plesha v. Ferguson, 725 F. Supp. 2d 106, 111 (D.D.C. 2010).  "[A] party asserting a claim for unjust enrichment must show that: 1) the plaintiff conferred a benefit on the defendant; 2) the defendant retains the benefit; and 3) under the circumstances, the defendant's retention of the benefit is unjust." Id. (internal quotation marks and citation omitted).

unjustly enriched because the agency did not compensate Saint-
Jean and Dorlus "free and clear." (Pls.' Opp'n at 21-22.)
District of Columbia common law recognizes *quantum meruit*,
meaning "as much as he deserves," as an implied-in-fact contract.
<u>Flemming, Zulack and Williamson, LLP v. Dunbar</u>, 549 F. Supp. 2d
98, 106 (D.D.C. 2008); <u>Saint-Jean I</u>, 2011 WL 4552982, at *3.  To
plead the claim, a plaintiff here must allege that D.C.'s conduct
implied the existence of a contractual relationship by
establishing 1) valuable services the plaintiff rendered, 2) for
the person from whom recovery is sought; 3) which services were
accepted and enjoyed by that person, and 4) under circumstances
which reasonably notified the person that the plaintiff, in
performing such services, expected to be paid. <u>Id.</u> (citations
omitted).  The plaintiffs allege that they rendered valuable
services to DOT, which DOT enjoyed. (2d Am. Compl. ¶¶ 13-15, 19-
21, 29, 31, 177.)  Drawing all reasonable inferences in the
plaintiffs' favor, they reasonably expected DOT would pay them
for their overtime hours after DOT represented that Saint-Jean
and Dorlus would be compensated. (<u>Id.</u> ¶ 177.)  See <u>Saint-Jean I</u>,
2011 WL 4552982, at *3.

However, the second amended complaint repeatedly describes
the scheme in which the plaintiffs participated as "illegal."
(<u>See, e.g.</u>, 2d Am. Compl. ¶¶ 2, 4-8, 37-38, 42-43, 55, 63, 157.)
The D.C. Court of Appeals "has been insistent that *quantum meruit*

-27-

recovery for performance in return for a promise unenforceable on public policy grounds is forbidden."[14] <u>Sturdza v. United Arab Emirates</u>, 11 A.3d 251, 257 n.26 (D.C. 2011) (internal quotation marks and citation omitted) (discussing contracts made in violation of a licensing statute or regulation); <u>see also</u> 8 Williston on Contracts § 19:75 (4th ed. 2011) ("one who has given illegal consideration or performed in whole or in part illegal acts . . . cannot recover reasonable compensation").  Its "'decisions rejecting any deviation from this rule span more than a quarter-century.'"  <u>Sturdza</u>, 644 F. Supp. 2d at 53 (quoting <u>Cevern v. Ferbish</u>, 666 A.2d 17, 19-20 (D.C. 1995)).  Smith's promise to assign to and compensate the plaintiffs for overtime hours in exchange for kickbacks runs contrary to public policy because a public agency's decisions as to work distribution and compensation should not be governed by private gain.[15]

---

   [14] Other courts have reached the same conclusion.  <u>See, e.g.,</u> <u>Am. Heritage Bancorp v. United States</u>, 61 Fed. Cl. 376, 388 (Fed. Cl. 2004) ("[n]o court will lend its assistance in any way to carry out the terms of an illegal contract, nor will the court enforce any alleged rights directly springing from such contract"); <u>Markon v. Unicorp Am. Corp.</u>, 645 F. Supp. 62, 64-65 (D.D.C. 1986) ("courts have refused to permit recovery on a <i>quantum meruit</i> basis" where a contingency fee contract was "contrary to federal policy and therefore unenforceable"); <u>Roberts v. Fin. Tech.</u>, No. 3:06-0055, 2007 WL 3125289, at *11 (M.D. Tenn. Oct. 23, 2007) ("No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out[.]") (quotation marks and citation omitted).

   [15] It is not necessary to reach the issue whether Smith's malfeasance is attributable to DOT since, even if DOT is liable,

-28-

Accordingly, the plaintiffs' *quantum meruit* claim will be
dismissed.

IV. DEFAMATION BY CONDUCT

The defendant argues that the plaintiffs' defamation claim
is foreclosed by the D.C. Comprehensive Merit Personnel Act
("CMPA"), D.C. Code § 1-601.01, et seq. (2001) under which the
plaintiffs have failed to exhaust their administrative remedies,
and by their consent to written warnings under their union's
collective bargaining agreement ("CBA").  D.C. also argues that
the claim should be dismissed for the plaintiffs' failure timely
to provide D.C. proper notice of the claim under D.C. Code § 12-
309.[16]  Finally, D.C. argues that the facts alleged do not state
a claim of defamation by conduct under District of Columbia
common law, and that the plaintiffs have failed to plead the
publication element of the claim.  (Def.'s Mot. [Dkt. #23] at 15-
17.)  Dorlus and Bourciquot claim to have exhausted their
administrative remedies by using the grievance procedures that
are contained in their union's CBA.  (Pls.' Surreply at 14-15.)

_____

D.C. caselaw bars *quantum meruit* recovery.

[16] D.C. also argues that the plaintiffs, as parties to the
CBA, consented to publication of written reprimands and notices
of suspension reflecting evaluations of their professional
performance.  (Def.'s Mot. [Dkt. #37-1] at 23-24; see also CBA at
5-6.)  Further, D.C. states that Hastings-Carey and Washington's
warnings are privileged unless the plaintiffs allege malicious
intent.  (Def.'s Mot. [Dkt. #37-1] at 23-24.)  These arguments do
not warrant discussion here in light of the multiple, alternate
grounds on which the defamation claim will be dismissed.

-29-

They also argue that DOT's defamatory statements included warnings issued between July 10 and 16, 2008, and that it defamed the plaintiffs by conduct when 1) Roberts suspended Bourciquot and Dorlus for being "AWOL" on July 18, 2008, and 2) "required a security guard to escort Bourciquot and Dorlus out of the New York Avenue Terminal lot in full view of their coworkers and in a manner that suggested they were part of criminal activity." (Pl.'s Opp'n at 23; 2d Am. Compl. ¶¶ 85-89, 182-84.)  Saint-Jean alleges that D.C. defamed her by conduct when Hastings-Carey and Washington issued four written warnings to her.  (2d Am. Compl. ¶ 185.)

A.   CMPA

"'The CMPA was enacted to provide employees of the District of Columbia an impartial and comprehensive administrative scheme for resolving employee grievances.'"  Bowers v. D.C., Civil Action No. 10-2056 (ESH), 2011 WL 2160945, at *7 (D.D.C. June 2, 2011) (quoting Holman v. Williams, 436 F. Supp. 2d 68, 74 (D.D.C. 2006)).  The Act "recognizes an employee's right to challenge an adverse employment decision *either* by using the grievance procedures that are contained in an employee's CBA negotiated by the union *or* by pursuing a remedy under the appeal process contained in the CMPA."  Brown v. Watts, 993 A.2d 529, 533 (D.C. 2010) (emphasis added).  The employee must choose and pursue one of these two "methods at the outset of the appeal."  Id. at 533-

534.  On the one hand, the CMPA appeal process "requires employees . . . to appeal an adverse action to the Office of Employee Appeals ("OEA"), whose final decision is appealable to the Superior Court."  Bowers, 2011 WL 2160945, at *7 (citing Thompson v. D.C., 978 A.2d 1240, 1242-43 (D.C. 2009)); see also Hoey v. D.C., 540 F. Supp. 2d 218, 231 (D.D.C. 2008) (dismissing defamation claims since the CMPA required the plaintiff "to [first] present them to OEA and obtain a Final Decision from that body before pursuing judicial relief").  On the other hand, the plaintiffs' CBA provides a four-step process for resolving grievances.  (Def.'s Mot. [Dkt. #23], Ex. 1, "Agreement Between the Transportation Administrator for DOT and Dist. Council 20" ("the CBA") at 6-9.)  These include a discussion between the employee and her immediate supervisor, the submission of a written grievance to DOT's Operations Manager, the submission of a written grievance to the Transportation Administrator, and a hearing before arbitrators appointed by the Federal Mediation and Conciliation Service ("FMCS").  Id.

The D.C. Circuit has not yet "resolv[ed] whether th[e] [CMPA] exhaustion requirement is better understood as jurisdictional or nonjurisdictional in federal court[.]"  Johnson v. D.C., 552 F.3d 806, 811 n.2 (D.C. Cir. 2008).  In Robinson v. D.C., 748 A.2d 409, 411 n.4 (D.C. 2000), a case involving defamation, emotional distress, and false light claims, the D.C.

-31-

Court of Appeals stated that "[t]he [CMPA] is jurisdictional and provides the exclusive remedy for almost all [work-related] claims[17] against public employers, with an opportunity to appeal to the Superior Court."  Where the CMPA applies, however, D.C. courts have exempted from the exhaustion requirement only tort claims based upon sexual harassment, which initially may be filed in Superior Court.  <u>Bowers</u>, 2011 WL 2160945, at *8 n.4. "[D]efamation claim[s] are . . . considered grievances [that] must be pursued through CMPA procedures."  <u>Jackson v. D.C. Dep't of Health</u>, Civil Action No. 06-1347 (EGS), 2007 WL 1307891, at *2 (D.D.C. May 3, 2007) (citing <u>Baker v. D.C.</u>, 785 A.2d 696, 697-98 (D.C. 2001)) (holding that defamation claims must be litigated under the CMPA); <u>Hoey</u>, 540 F. Supp. 2d at 231.

Saint-Jean has neither pled nor argued that she exhausted her administrative remedies under either of the CMPA's two approved methods.  <u>See</u> <u>Brown</u>, 993 A.2d at 533.  Her defamation claim therefore is preempted by the CMPA, which is "the exclusive avenue by which aggrieved employees of the District of Columbia may pursue work-related complaints."  <u>Evans v. District of Columbia</u>, 391 F. Supp. 2d 160, 170 n.5 (D.D.C. 2005).  Drawing all reasonable inferences in Bourciquot's and Dorlus's favor, however, they timely "file[d] a grievance in writing in

_____

[17] "Work-related complaints . . . include common-law tort claims against the employee's supervisors." <u>Evans</u>, 391 F. Supp. 2d at 170 n.5.

-32-

accordance with the provision of the negotiated grievance

procedure[,]" triggering the CBA method of CMPA exhaustion.

Johnson v. D.C., 368 F. Supp. 2d 30, 37 (D.D.C. 2005) (quoting

D.C. Code § 1-616.52(f)).  (See 2d Am. Compl. ¶¶ 100-104.)  Yet

after Dorlus and Bourciquot's "Stage 2 grievance hearing[s]" were

cancelled on September 18 and 19, 2008, respectively, they did

not proceed to the final three steps of the grievance procedure

which culminate in arbitration.  (Def.'s Mot. [Dkt. #23], CBA at

8-9.)  Neither have they pled that they appealed any arbitration

decision to the Public Employee Relations Board.  Johnson, 368 F.

Supp. 2d at 37 (citing D.C. Code § 1-605.02(6) (authorizing PERB

review of arbitration awards)).  Since none of the plaintiffs has

pled exhaustion of her administrative remedies as to this claim,

it is subject to dismissal.[18]  Johnson, 368 F. Supp. 2d at 46

(dismissing defamation claim for failure to exhaust

administrative remedies under the CMPA).

    B.   Notice under § 12-309

    D.C. also argues that the plaintiffs' failure to provide

notice to D.C. of their defamation claim -- as to the suspension

Roberts issued and the warnings Hastings-Carey wrote -- bars

---

[18] The plaintiffs offer no authority supporting the
proposition that their administrative remedies were inadequate.
(See Pls.' Surreply at 15.)

-33-

relief.[19]  (Def.'s Mot. [Dkt. #37-1] at 24-26.)  Under D.C. Code

§ 12-309,

> [a]n action may not be maintained against the District
> of Columbia for unliquidated damages to person or
> property unless, within six months after the injury or
> damage was sustained, the claimant, his agent, or
> attorney has given notice in writing to the Mayor of
> the District of Columbia of the approximate time,
> place, cause, and circumstances of the injury or
> damage.

Bonaccorsy v. D.C., 685 F. Supp. 2d 18, 23 (D.D.C. 2010) (quoting

D.C. Code § 12-309).  "The notification requirement is strictly

applied[] and . . . 'construed narrowly' against claimants" at

this stage of litigation.  Id. (quoting Snowder v. D.C., 949 A.2d

590, 600 (D.C. 2008)).  (Compare Pls.' Surreply at 14 (stating

that the matter of notice is not properly before the court)).

The plaintiffs neither assert nor provide a factual basis for the

assertion that they provided adequate notice to D.C. of these

alleged injuries.  See Bonaccorsy, 685 F. Supp. 2d at 23

("'Notice of one type of injury . . . is not notice of another

type of injury incurred in the same incident.'") (quoting Breen

v. D.C., 400 A.2d 1058, 1062 (D.C. 1979)).  Accordingly, the

defamation claim based upon conduct by Roberts and Hastings-Carey

will be dismissed also for failure to comply with § 12-309.

---

[19] The opening line of the plaintiffs' response states that
D.C.'s notice argument "is not inaccurate."  (Pls.' Surreply at
13.)

-34-

C.   <u>Prima facie case</u>

In the District of Columbia, "a statement is defamatory if it tends to injure [the] plaintiff in [her] trade, profession or community standing, or lower [her] in the estimation of the community." <u>Saint-Jean I</u>, 2011 WL 4552982, at *3 (quoting <u>Guilford Transp. Indus., Inc. v. Wilner</u>, 760 A.2d 580, 594 (D.C. 2000)).  To plead a defamation claim, a plaintiff must allege "'1) that the defendant made a false and defamatory statement concerning the plaintiff; 2) that the defendant published the statement without privilege to a third party; 3) that the defendant's fault in publishing the statement amounted to at least negligence; and 4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'"  <u>Id.</u> (quoting <u>Williams v. D.C.</u>, 9 A.3d at 491).  However, "actionable defamation is not necessarily restricted to verbal conduct[.]" <u>Clampitt v. Am. Univ.</u>, 957 A.2d 23, 39 (D.C. 2008) (quotation marks and citation omitted); <u>see also</u> <u>Wallace v. Skadden, Arps, Slate, Meagher & Flom</u>, 715 A.2d 873, 878 n.5 (D.C. 1998) (holding that defendant's deactivation of the plaintiff's access key could not "fairly be characterized as non-defamatory as a matter of law").[20]

---

[20] In <u>Wallace</u>, the D.C. Court of Appeals "accept[ed] as true . . . that [the alleged defamatory conduct -- the deactivation of an employee's access key after she was fired from the law firm]

-35-

In resolving a Rule 12(b)(6) motion, "the Court may only consider whether a statement *cannot* be reasonably capable of a defamatory meaning." Armenian Assembly of Am., Inc. v. Cafesjian, 597 F. Supp. 2d 128, 141 (D.D.C. 2009) (citation omitted) (emphasis in original). "[I]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not" defamatory. Id. (internal quotation marks and citation omitted). "Context is key," id. (collecting cases), and "the publication must be considered as a whole, in the sense [that] it would be understood by the readers to whom it was addressed." Ihebereme v. Capital One, N.A., 730 F. Supp. 2d 40, 56 (D.D.C. 2010).

The plaintiffs have not stated a claim for defamation because they have not pled that the offending statements or conduct were "published" to third parties. See Saint-Jean I, 2011 WL 4552982, at *3 (describing the second element of a defamation claim as publication). They make no allegation that

_____

was ordinarily meted out *only* to attorneys who had engaged in criminal or unethical activity." Wallace v. Skadden, Arps, Slate, Meagher & Flom, 715 A.2d 873, 878 n.5 (D.C. 1998) (emphasis added); see also Benic v. Reuters America, Inc., 357 F. Supp. 2d 216, 222 (D.D.C. 2004). Here, however, the plaintiffs have not pled that publicly escorting employees off of DOT property was a sanction reserved for suspected criminals or their likes.

the warnings Hastings-Carey issued were disclosed to anyone other than the plaintiffs themselves.  (2d Am. Compl. ¶¶ 184-85.) Likewise, the plaintiffs do not assert that their suspensions were made public.  The warnings and suspensions therefore are "not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense[.]"  Armenian, 597 F. Supp. 2d at 141.  (Compare 2d Am. Compl. ¶ 201 ("DOT . . . issu[ed] repeated and unnecessary warnings and suspension[s].").)

    The plaintiffs likewise have cited no authority reflecting that a security guard escort, even in public view, constitutes publishing defaming conduct under D.C. law.  The context described here does not either.  (See 2d Am. Compl. ¶¶ 89-91.) The plaintiffs describe the humiliation and shame they felt as "other employees laughed at and mocked" them (2d Am. Compl. ¶¶ 90-91) -- a decidedly unpleasant experience.  However, "'[a]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous.'"  Armenian, 597 F. Supp. 2d at 140-41 (quoting Johnson v. Johnson Publ'g Co., 271 A.2d 696, 697 (D.C. 1970)) (internal quotation marks and citation omitted).  "[A]t this stage in the litigation[,] the Court need not find that the statements actually portrayed plaintiff in an 'odious, infamous, or ridiculous' light, but must merely find the statements 'reasonably susceptible of a defamatory meaning,' in order to

-37-

find that plaintiff has stated a claim." <u>Ihebereme</u>, 730 F. Supp.
2d at 56 (quoting <u>Clawson v. St. Louis Post-Dispatch, L.L.C.</u>, 906
A.2d 308, 313 (D.C. 2006)) (emphasis in original).

Here, the plaintiffs have not pled that they were dragged,
gagged, handcuffed or otherwise restrained, or that the security
guard shouted at or insulted them while he escorted them "from
the trailer to the gate[.]"  (2d Am. Compl. ¶¶ 89, 183.)  They do
not allege that the guard openly declared them to be criminals or
charlatans.  Instead, they offer the "'naked assertion[,]'"
<u>Iqbal</u>, 129 S. Ct. at 1949, that the guard escorted them "in a
manner that suggested [that] they had engaged in criminal
activity."  (<u>Id.</u> ¶ 183.)  "[D]evoid of 'further factual
enhancement[,]'" this allegation does not satisfy the publication
prong of a defamation by conduct claim.  <u>See Iqbal</u>, 129 S. Ct. at
1949.  On these alleged facts, publicly escorting the plaintiffs
off of DOT property "*cannot* be reasonably capable of a defamatory
meaning." <u>Armenian</u>, 597 F. Supp. 2d at 141.

Accordingly, the defamation claim will be dismissed.

<u>CONCLUSION AND ORDER</u>

The plaintiffs have sufficiently pled their WPA and FLSA
claims.  However, their *quantum meruit* claim is barred as based
upon an illegal arrangement, and they have failed to state a
claim for defamation by conduct.  Accordingly, it is hereby

-38-

ORDERED that D.C.'s motion [23, 37-1] to dismiss will be GRANTED IN PART and DENIED IN PART.  The motion will be GRANTED as to the plaintiffs' *quantum meruit* and defamation by conduct claims.  The motion will be DENIED as to the plaintiffs' WPA claim, and as to those portions of the plaintiffs' FLSA claim that post-date October 16, 2005.

SIGNED this 7th day of March, 2012.

                                        _____/s/_____
                                        RICHARD W. ROBERTS
                                        United States District Judge