# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
MICA SAINT-JEAN, *et al.*,                            )
)
          Plaintiffs,                            )
)
      v.                                              )      Civil Action No. 08-1769 (ABJ)
)
DISTRICT OF COLUMBIA,                          )
)
          Defendant.                              )
_____)

## MEMORANDUM OPINION & ORDER

Plaintiffs Mica Saint-Jean and Guerline Bourciquot, who worked as a bus driver and a bus attendant for the District of Columbia Department of Transportation ("DOT") brought this action against the District of Columbia under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the District of Columbia Whistleblower Protection Act ("DC WPA"), D.C. Code § 1-615.51 *et seq.*, and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* 2d Am. Compl. [Dkt. # 88] ¶¶ 154–203.

After extensive pre-trial proceedings, the case was tried before a jury beginning on May 22, 2017. At the close of plaintiffs' case, the District moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). May 24, 2017 Tr. [Dkt. # 256] at 16–33. The Court deferred ruling on defendant's motion until after the jury returned a verdict. *Id.* at 33:20–34:20. On May 31, 2017, the jury returned a verdict in favor of both plaintiffs on all three counts. Verdict Form as to Mica Saint-Jean [Dkt. # 245]; Verdict Form as to Guerline Bourciquot [Dkt. # 247]. The question of the availability of back pay or other equitable relief was left for the Court to decide.

After the verdict was returned, the District renewed its motion under Federal Rule 50(b). D.C.'s Renewed Mot. for J. as a Matter of Law [Dkt. # 253]. In a bench ruling on November 27, 2017, the Court granted the motion in part as to plaintiffs' Title VII claims, and denied it in part as to the WPA and FLSA claims. Nov. 27, 2017 Unofficial Tr. at 11:20–12:1; *id.* at 30:20–25; *id.* at 49:5–6;[1] Min. Entry (Nov. 27, 2017). In a minute order dated December 22, 2017, the Court noted that "final judgment has not yet been entered[] because the Court was awaiting the outcome of the Rule 50(b) motion and the hearing on equitable relief, and it is correct that it is the entry of judgment that starts the clock ticking for Rule 59 or 60." Min. Order (Dec. 22, 2017).

The Court then set a date for the hearing on equitable relief, which took place on February 8, 2018. Min. Entry (Feb. 8, 2018). On February 21, 2018, the Court issued its ruling on equitable relief from the bench, and an order entering judgment in favor of plaintiffs was docketed the

---

1       Any citations to transcripts that are not docketed are based on the Court's review of the unofficial transcripts as well as the Court's notes from the hearings.

2

following day.  *See* Min. Entry (Feb. 21, 2018); Order [Dkt. # 297].[2]  Ultimately, the Court entered judgment in favor of plaintiff Saint-Jean in the amount of $226,948.00, and in favor of plaintiff Bourciquot in the amount of $15,416.28.  Order [Dkt. # 308].

---

2      Plaintiff Saint-Jean challenges defendant's motion as untimely, although she did not raise this issue until she filed her sur-reply, and she provides no case law or analysis in support of her argument.  Pl.'s Sur-reply to Def.'s Reply [Dkt. # 314] ("Pl.'s Sur-reply") at 2.  Defendant was granted leave to file a response to plaintiff's sur-reply in order to address this issue.  *See* Min. Order (May 16, 2018); Def.'s Mot. for Leave to File Resp. to Pl.'s Sur-reply [Dkt. # 318] ("Def.'s Resp. to Pl.'s Sur-reply").  Federal Rule of Civil Procedure 58 governs the entry of judgment, and it requires that every judgment "must be set out in a separate document," with limited exceptions.  Fed. R. Civ. P. 58(a).  Because one of those exceptions is a judgment under Rule 50(b), the Court was not required to enter judgment in a separate order when ruling on the District's Rule 50 motion on November 27, 2017.  *Id.* 58(a)(1).  And the Court recognized that final judgment in the case would not be entered until after the hearing on equitable relief.  *See* Min. Order (Dec. 22, 2017).  Although the Court made an oral ruling on equitable relief on February 21, a final judgment was not entered until the Court entered the written order on February 22 because a separate order was required under Rule 58.  *See* Order [Dkt. # 297].  And even if a separate order was not legally required by Rule 58 because the ruling on equitable relief could be interpreted as an extension of the ruling on the Rule 50(b) motion, the Court's unambiguous use of the future tense when it ruled from the bench, *see, e.g.*, Feb. 21, 2018 Unofficial Tr. at 8:20–9:1 ("I will, in my discretion, . . . order the defendant to pay lost wages or backpay to both Miss Saint Jean and Ms. Bourciquot."); *id.* at 11:9–14 ("So, the Court will enter judgment for plaintiff . . . .  This will be put in a written order . . . ."); *see also* Min. Entry (Feb. 21, 2018) ("Judgment is to be entered for the Plaintiffs. (written order forthcoming)."), indicated that the entry of a separate order on February 22 was meant to trigger any appeal rights as well as the twenty-eight day clock for the filing of a Rule 59 motion.

     Defendant also argues that the February 22 order may not have conformed with what is required under Rule 58 and that, instead, pursuant to Rule 58(c)(2)(B), judgment was not entered until "150 days have run from the entry in the civil docket," which would be July 22, 2018.  Def.'s Resp. to Pl.'s Sur-reply at 2–3; *see* Fed. R. Civ. P. 58(c)(2)(B) (providing that, "if a separate document is required," judgment is entered at the earlier of two events:  the judgment "is set out in a separate document," or "150 days have run from the entry [of judgment] in the civil docket").  The requirement to enter judgment in a separate document is meant to avoid speculation "on the running of time limits" and to make it clear that an order is not combined with a memorandum opinion.  *Kidd v. District of Columbia*, 206 F.3d 35, 39 (D.C. Cir. 2000), citing *Diamond ex rel. Diamond v. McKenzie*, 770 F.2d 225, 230 (D.C. Cir. 1985).  Thus, "orders combining the court's directives with its statement of factual findings or legal conclusions plainly cannot pass muster as separate documents."  *Id.*, quoting *Diamond*, 770 F.2d at 234.  But an order can still qualify as a "separate document" under Rule 58 if it includes one citation to legal authority and one sentence explaining the Court's reasoning.  *Id.*  [Continued on next page].

3

Pending before the Court is defendant's motion for a new trial, or in the alternative, to alter or amend the judgment, under Federal Rule of Civil Procedure 59. *See* D.C.'s Mot. for New Trial or, in the Alternative, to Alter or Amend J. [Dkt. # 303] ("Def.'s Mot.").[3] Defendant argues that a new trial, or an amended judgment, is necessary because "the verdict was against the weight of the evidence on all claims" and "to correct a clear error or prevent manifest injustice." *Id.* at 5.

The District argues that:  (1) the jury's finding that an agency relationship existed between David Gilmore and the Department of Transportation was against the weight of the evidence; (2) the Court erred by admitting the Office of Inspector General's report related to the investigation of plaintiffs' allegations because it was hearsay; and (3) there was insufficient evidence of causation and retaliatory intent, and the Court erred by not instructing the jury that temporal proximity alone is insufficient to prove retaliation. *See generally* Def.'s Mot.[4]

But the Court finds that there is no clear error to rectify in this case and that the jury verdict that survived the Rule 50 motion comports with the law and the evidence. Because the District has not made a showing that would warrant a new trial or the amendment of the judgment, the

---

[Continued from previous page].  The District argues that the Court's order "does not conform with the one-citation, one-sentence rule," Def.'s Resp. to Pl.'s Sur-reply at 3, but the Court's order contained no citations to legal authority and not even one sentence of reasoning. Other than the Court's references to the statutes under which it was awarding equitable relief, "it consists simply of ordering clauses." *See Kidd*, 206 F.3d at 39 (upholding a district court's order that contained ordering clauses, references to the motions being decided, and one "conclusory sentence of justification"). Thus, the February 22 order satisfied Rule 58, and because the District filed its motion exactly twenty-eight days after it was issued, the motion is timely.

3       The motion is fully briefed.  *See* Pl. Mica Saint-Jean's Opp. to Def.'s Mot. [Dkt. # 306] ("Pl.'s Opp."); Reply to Pl.'s Opp. [Dkt. # 310] ("Def.'s Reply"); Pl.'s Sur-reply; Def.'s Resp. to Pl.'s Sur-reply.

4       Originally, defendant also argued that the Court improperly limited the evidence related to Michael Zeurblis's investigation. *See* Def.'s Mot. at 7.  But, defendant withdrew that argument. *See* Def.'s Reply at 14 n.4.

motion will be denied.  The proceedings in the trial court in this case have finally come to their conclusion, and the outcome was just.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 59(a)(1)(A), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  "Such reasons exist (1) where the verdict is against the weight of the evidence, or (2) where 'the trial was not fair, or substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions.'" *Lee v. District of Columbia*, 19 F. Supp. 3d 281, 285–86 (D.D.C. 2014), citing *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 433 (1996) and quoting *Nyman v. FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997).  "A new trial 'should be granted only where the court is convinced that the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice.'" *Lee*, 19 F. Supp. 3d at 286, quoting *Martinez v. District of Columbia*, 503 F. Supp. 2d 353, 355 (D.D.C. 2007).  While the "standard for a new trial is less onerous than one applicable to a Rule 50 motion" for judgment as a matter of law, *Nyman*, 967 F. Supp. at 1569 (citation omitted), the decision to grant a motion for a new trial lies within "the sound discretion of the trial court." *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985), citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

"Motions under Fed. R. Civ. P. 59(e) are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001), citing *Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. Cir. 1998).  "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of

new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004), quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).

A motion to alter or amend the judgment under Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008), quoting 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2810.1 (2d ed. 1995). Rather, motions to alter or amend a judgment "are intended to permit the court to correct errors of fact appearing on the face of the record, or errors of law." *Hammond v. Kempthorne*, 448 F. Supp. 2d 114, 118 (D.D.C. 2006), quoting *Indep. Petroleum Ass'n of Am. v. Babbit*, 178 F.R.D. 323, 324 (D.D.C. 1998).

## ANALYSIS

### I.    Agency Relationship

Defendant argues – once again – that there was insufficient evidence that David Gilmore was the District's agent. But the District has presented nothing new that would change the Court's consistent rulings on this issue.

The District contends that plaintiffs' only evidence of an agency relationship was the consent decree from the *Petties* litigation. Def.'s Mot. at 6. It maintains that language in an agreement "is not conclusive" and is only "properly considered in the overall calculus." *Id.* Thus, it argues, "[b]y offering the language of the agreement and failing to offer any evidence of the actual working relationship between Gilmore and the District, [p]laintiffs offered insufficient evidence." *Id.* Second, the District contends that even if the jury could rely on the agreement alone, the agreement alone does not support a jury verdict in their favor. *Id.* So the verdict is "against the weight of the evidence, and should be overturned." *Id.*

Defendant made an almost identical argument in its Rule 50(b) motion, and the Court rejected it for a number of reasons, all of which pertain again.

**A.      Plaintiffs' presented, and the jury relied upon, more than just the *Petties* Consent Order in concluding that Gilmore was the District's agent.**

The issue of Gilmore's status was first raised in a motion to dismiss in which the District argued that "because DOT was under a receivership during the relevant time, the District cannot be held liable – either directly or vicariously – for actions taken by the receiver."  *Saint-Jean v. District of Columbia*, 74 F. Supp. 3d 274, 278 (D.D.C. 2014).  But the Court then assigned to the matter concluded that "[i]t is not readily apparent from the consent order [appointing Gilmore] . . . that [his] position of Transportation Administrator was intended to be identical to that of a receiver," *id.* at 279, and it went on to describe, in great detail, all the ways in which Gilmore's appointment as an official of DOT differed from that of a traditional receiver.  *Id.* at 279–80.  The Court then suggested that the question would be better addressed by "analyzing whether agency principles justify insulating the District from liability."  *Id.* at 281.

At the close of discovery, then, the District moved for summary judgment on the grounds that "the District cannot be held vicariously liable for employment measures taken by Transportation Administrator ("TA") David Gilmore ("Gilmore") because he was not the District's agent or employee," and it based that motion on agency principles.  D.C.'s Mot. for Summ. J on Counts I, II, III, VI, VII of the Second Am. Compl. [Dkt. # 167] at 1; *see* Mem. of P. & A. in Supp. of D.C.'s Mot. for Summ. J. [Dkt. # 167] at 7–12.  In denying the motion, the Court laid out the law governing agency relationships, and it noted that under District of Columbia law, "[w]hether an agency relationship exists is a question of fact for which the person asserting it carries the burden of proof."  Mem. Op. & Order [Dkt. # 192] at 8, quoting *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982).  The Court went on:

> "First, the court must look for evidence of the parties' *consent* to establish a principal-agent relationship.  Second, the court must look for evidence that the activities of the agent are subject to the principal's *control*." *Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989) (emphasis in original).  The factors to be considered in determining whether an agency relationship exists "include '(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer.'" *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. Cir. 2000), quoting *LeGrand v. Ins. Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968).

*Id.*  The Court denied defendant's motion because there was a genuine dispute over the extent of Gilmore's independence and authority under the *Petties* Consent Order.  *Id.* at 11.

The District sought reconsideration of the Court's decision, *see* Mot. for Recons. of Ct.'s Sept. 12, 2016 Order Den. Summ. J. in Def.'s Favor [Dkt. # 194], but that motion was also denied. Mem. Op. & Order [Dkt. # 199].  In concluding that "a question remain[ed] with regard to the extent of Gilmore's authority and independence under the *Petties* Consent Order that precludes the Court from making a finding on the agency question as a matter of law," the Court observed:

> Gilmore's role as Transportation Administrator was a unique, specialized, and somewhat hybrid position that was neither the same as a receiver or a special master, who is the agent of the appointing court.  For example, the record reflects that Gilmore was appointed specifically to "avert[ ] the substantial possibility that the [c]ourt would grant plaintiffs' motion to put DOT into receivership," which would have "stripp[ed] [D.C. Public Schools] entirely of its authority to manage the transportation function." *Saint-Jean*, 74 F. Supp. 3d at 279, quoting *Petties v. District of Columbia*, No. 95-0148 (PLF), 2006 WL 1046943, at *5 (D.D.C. Apr. 21, 2006). Gilmore's appointment was designed so that he "was not granted complete authority or control over DOT," and instead, his power and authority was subject to "consultation with the Superintendent." *Id.*; *see also Petties* Consent Order at 6.  The *Petties* Consent Order also provided that Gilmore's appointment was designed to meet the dual purposes of "resolv[ing] the issues raised in [the *Petties* plaintiffs'] Motion to Appoint a Receiver while permitting the government of the District of Columbia to remain *intimately involved and responsible for* its obligations under the Orders in this case and other requirements of law." *Petties* Consent Order at 1–2 (emphasis added).

Mem. Op. & Order [Dkt. # 199] at 6–7.

The question of whether Gilmore was the District's agent was put to the jury with the following instruction:

> Plaintiffs claim that David Gilmore was an agent of the District of Columbia – that is, that he was acting on the District's behalf – when plaintiffs' employment was terminated at the Department of Transportation. The District maintains that he was not its agent.  This issue is being submitted to you to decide, and you will be asked for your answer on the verdict form.
>
> Plaintiffs must establish the existence of an agency relationship and that Mr. Gilmore acted within the scope of that relationship if and when he took any materially adverse action that is the basis for plaintiffs' retaliation claims. Plaintiffs have the burden of proving those facts by a preponderance of the evidence.
>
> The question to be decided is whether Mr. Gilmore was an agent of the District of Columbia in connection with the termination of DCPS DOT employees; you need not decide if he was an agent for all purposes.
>
> Generally, an agency relationship exists when one person or entity authorizes another to act on its behalf, subject to its control, and the other agrees to do so.  Control is generally an important factor to consider.
>
> But, whether an agency relationship exists in a given situation, though, depends upon the particular facts of each case.  In determining whether each plaintiff has proved that such a relationship exists here, you may consider all of the following factors:
>
>   1. The selection and engagement of Mr. Gilmore;
>   2. The payment of Mr. Gilmore's wages;
>   3. The power of the District to discharge Mr. Gilmore;
>   4. The power of the District to control Mr. Gilmore's conduct; and
>   5. Whether Mr. Gilmore's work was part of the regular business of the District.
>
> In analyzing the right to control, you may consider the actual relationship between the parties and the language of any agreement between them.

Jury Instrs. [Dkt. # 249] at 38–40.  The jury was asked to respond to a special interrogatory on the subject, and it found that Gilmore was the District's agent.  *See* Pl. Saint-Jean Verdict Form [Dkt. # 245] at 3; Pl. Bourciquot Verdict Form [Dkt. # 247] at 3.

When the District made its Rule 50 motion at the close of plaintiffs' case, it seemed to be operating under the misimpression that only the testimony of the witnesses could be considered when weighing the sufficiency of the "evidence" on the issue.  *See* May 24, 2017 Tr. [Dkt. # 265] at 120:12–21:8.[5]  That was plainly incorrect.  Not only does the jury instruction make it clear that both the parties' actual conduct and the language of any agreement may be considered, but the jury

---

5       The Court had the following exchange with defense counsel:

> MS. MULLEN: The point at this juncture is not to debate what the consent decree is about. The question is have the plaintiffs met their burden –
>
> THE COURT: They put the consent decree in evidence. . . .
>
> MS. MULLEN: Hold on a second. There's not been any testimony – may it please, I'm sorry. There's not been any testimony about it. So how can the jury then take this and know what to do with it? It's a consent decree. Your Honor determined that there were questions of fact –
>
> . . .
>
> MS. MULLEN: Those are questions of fact that Plaintiff did not address in their case-in-chief.
>
> THE COURT: Plaintiff has addressed it in their case-in-chief by moving exhibits in.  And you are making your argument about why these exhibits are insufficient, but the fact that a human being did not add to those exhibits is not critical. The question is is there evidence.
>
> . . .
>
> MS. MULLEN: I thought the plaintiffs have the burden. I didn't think their burden was met simply by putting in documents.
>
> THE COURT: It could be. It could be enough for a document to meet somebody's burden. It could.
>
> MS. MULLEN: We understood –
>
> THE COURT: By a preponderance of the evidence. And that's not the only evidence that came in.
>
> MS. MULLEN: We understood that they needed to call Mr. Gilmore.
>
> THE COURT: Well, you may have understood that, but I don't know that that's necessary.

May 24, 2017 Tr. [Dkt. # 265] at 126:11–28:16.

received the standard and the unobjectionable instruction that: "[t]he evidence consists of the sworn testimony of witnesses, exhibits admitted into evidence, and facts stipulated by the parties." Jury Instrs. [Dkt. # 249] at 11.

In denying the District's Rule 50(b) motion, the Court reviewed all of the evidence in the record that related to the five factors, and some of that evidence included:

- The *Petties* Order, which supplied evidence that (1) the District, because it wanted to avoid the appointment of a receiver, specifically consented to the appointment of Gilmore to run its agency; (2) Gilmore was acting on the District's behalf when he hired and fired employees, which the District specifically granted him authority and paid him to do; and (3) there was supposed to be some level of control in the form of continuing involvement and oversight by District personnel.

- Bourciquot's recommendation for suspension (Exhibit 4); Bourciquot's recommendation for termination (Exhibit 5); proposed termination letter to Bourciquot (Exhibit 7); letter notifying Bourciquot of termination (Exhibit 9); proposed termination letter to Saint-Jean (Exhibit 10); and Bourciquot's suspension paperwork (Exhibit 56), all of which were printed on letterhead containing the District of Columbia Public School seal and the phrase "Division of Transportation/Office of Transportation Administration," and the Penn Center address on the bottom of the page.

- "Request for Employment Action" paperwork that terminated Bourciquot's employment and stopped her paychecks (Exhibit 62), which was signed by the Assistant Transportation Administrator and the Transportation Administrator (Gilmore), as well as the Budget Director and Chief Operations Officer. This form says D.C. Public Schools on the upper left hand corner, and Office of Human Resources in the upper right hand corner.

The District takes the position now that plaintiffs' only evidence of an agency relationship was the consent decree from the *Petties* litigation. Def.'s Mot. at 6. Just based on a review of the above-cited evidence alone, it is clear that defendant's renewed argument has no merit. Contrary to defendant's contentions, plaintiff did not merely rely on the *Petties* Order; there were a number of exhibits. Moreover, the jurors heard testimony from Gilmore himself:

- Gilmore testified that DOT operated out of Penn Center before he got there and that his office was located there. May 25, 2017 Tr. [Dkt. # 266] at 40:15–41:11.

11

- Gilmore testified that he oversaw the DOT; he "was totally responsible for the personnel, hiring, firing, supervising, assigning them to bus routes, and so on and so forth"; he was the "final authority"; that "whoever did the payroll for DCPS" was who stopped paying employees when they were terminated.  May 25, 2017 Tr. [Dkt. # 266] at 20:20–25; *id.* at 56:12–17; *id.* at 30:22–31:1.

All of this was put to the jury to consider.  As the Court already stated in its ruling on the District's Rule 50(b) motion, the jury was presented with evidence – some of which the Court has not discussed again, and some of which did indeed favor the District's position – and it was up to the jury to resolve disputed questions of fact and to weigh witness credibility.  Based on the evidence presented to the jury, which consisted of far more than merely the *Petties* Order, the Court cannot find that the jury's decision was "seriously erroneous."  *Lee*, 19 F. Supp. 3d at 286.

In its reply brief, the District raised two more arguments that fare no better.[6]  First, the District argues that at trial, "the Court severely limited evidence about the purpose for which a federal judge appointed Gilmore and foreclosed testimony related to his understanding of the *Petties*' Consent Order or, its similarities with other remedial orders he had helped the courts implement, despite the fact that the consent order was plaintiff's key evidence."  Def.'s Reply at 9.  Second, defendant maintains that the Court "exacerbated this error when it refused to instruct

---

[6]     Plaintiff maintains that the Court should not consider these arguments because defendant raised them for the first time in its reply brief.  Pl.'s Sur-reply at 3.  Defendant points to the language in its motion that the "Court mistakenly framed the agency issue."  Def.'s Resp. to Pl.'s Sur-reply at 4.  Plaintiff makes a fair point since defendant's motion for a new trial was such a highly summary submission that the Court felt compelled to offer defendant the opportunity to cure its deficiencies in connection with its reply.  *See* Min. Order (Apr. 5, 2018) ("In any reply to the opposition, defendant must either:  1) direct the Court to the specific portions of the record that relate to its contentions, including, for example, the place in the record where evidence that is being challenged at this time was objected to or admitted; where any allegedly excluded evidence was proffered and ruled upon; or where any jury instruction that defendant claims should have been given was proposed by the defense and rejected by the Court; or 2) show cause why a motion that fails to do so is sufficient to meet the requirements for a motion under Federal Rule 59 and Federal Rule 7(b)(1)(B).").  In any event, when the arguments were first raised is of little moment since plaintiff was afforded the opportunity to file a sur-reply, and then defendant was able to file a response to that sur-reply.

the jury that 'control' was a key factor and 'the decisive test' for determining the principal-agent relationship." *Id.*

B.     **The Court did not improperly limit evidence related to the *Petties* Consent Order.**

In making its argument that the Court improperly limited evidence about the *Petties* Consent Order, the District points to one small section of testimony elicited by the defense in its case in chief from its witness, Michael Zuerblis, on May 23, 2017.  The witness testified about his role at DOT under Gilmore, as well as his general understanding of the *Petties* Order and why the department was under court supervision.  *See* May 23, 2017 Tr. [Dkt. # 261] at 194:24–96:11.

But when Zuerblis began testifying about how disabled students could be negatively affected by late buses, the Court stopped his testimony and called counsel to the bench.  May 23, 2017 Tr. [Dkt. # 261] at 195:13–96:13.  After a lengthy discussion with defense counsel, the Court precluded Zuerblis from giving any sort of expert opinion on the topic of the consent decree, as well as from giving his opinion about the impact an employee's absence without official leave could have on the students riding the buses.  May 23, 2017 Tr. [Dkt. # 261] at 196:15–200:11.  The Court explained the basis for its ruling:  there was no allegation that plaintiffs were fired for being AWOL, and Zuerblis had no personal knowledge of why plaintiffs were fired.  *Id.* at 198:18–99:8.  When the Court made that point, defense counsel said, "That's true."  *Id.* at 200:4.

The Court then said to defense counsel:  "I think you've laid enough background.  Now you need to go to something that leads to this case directly, that he has personal knowledge about, otherwise he doesn't have anything to say.  He's not an expert."  May 23, 2017 Tr. [Dkt. # 261] at 200:5–9.  Defense counsel "agree[d] with that," *id.* at 200:10–11, and moved on without noting any objection for the record.  So there is a serious question about whether defendant has even preserved any objection on this precluded line of questioning.

In any event, defendant's argument is not supported by any portion of the record cited in its reply brief. Defendant maintains that the Court "foreclosed testimony related to [Gilmore's] understanding of the *Petties'* Consent Order or, its similarities with other remedial orders he had helped the courts implement." Def.'s Reply at 9. But it only points to testimony it sought to elicit from Zuerblis, not Gilmore. And if Gilmore's understanding was to be elicited through Zuerblis, that testimony would have been hearsay. Moreover, in the cited testimony, there is no mention of Zuerblis's knowledge of receiverships in general, or how the *Petties* Order compares to other remedial orders. So the only argument that defendant put on paper fails.

It is true that the Court excluded certain testimony when Gilmore testified,[7] but the District did not seek a new trial on those grounds. And even if this omission was the result of inadvertence

---

7    Plaintiff objected to Gilmore's testimony interpreting the *Petties* Order. *See* May 25, 2017 Tr. [Dkt. # 266] at 23:11–15 ("A. Well, I think that the parties and the Court had in mind that the transportation system – MR. COYLE: Objection, Your Honor."). The Court told the witness that he could not "testify to what the parties had in mind" in agreeing to the terms of the order, but that he could speak to what his understanding was when he was the Transportation Administrator. *Id.* at 23:16–21.

After defense counsel asked Gilmore "[t]o what extent did you have to consult with the superintendent in order to carry out your day-to-day operations?," plaintiff objected again, requesting a clarification if defense counsel was "asking per the order or per what he actually did?" *Id.* at 26:11–16. The Court had the following conversation with counsel at the bench:

> MS. MULLEN: This order compels them to do certain things. He was subject to this order. Why he cannot talk about what the order required him to do is puzzling to me. He was subject to this.
>
> THE COURT: He's talking about why –
>
> MS. MULLEN: Right. And I know Your Honor cut that off and that's fine.
>
> [Continued on next page]

and not strategy, including an argument in the Rule 59 motion based on any limitations to
Gilmore's testimony would not have changed the outcome here.  The Court would have ruled that
any similarities between the *Petties* Order and other orders creating receiverships were properly
excluded as irrelevant since Gilmore was not a receiver, and his status was to be analyzed under

> [Continued from previous page]

> THE COURT: – [W]hat he was required to do by the order is still in the
> order. So what he can add which isn't written on the page is in executing
> this did you consult with the superintendent for any of these things. What
> it says "after consultation with the superintendent." So he says no, I didn't
> have to consult that. He says that. So the question is what did you do. And
> to me the budget, none of that is relevant. The only part that's relevant is
> whether he was acting as an agent with respect to hiring and terminating
> employees, et cetera. That's . . . [the] issue here, not whether he was acting
> as an agent for the District doing something else.

*Id.* at 26:20–27:15.

Later, plaintiff objected to defense counsel's line of questioning seeking to compare how
Gilmore was paid in this instance to how he was paid when he served in other court-appointed
official roles.  *Id.* at 57:14–20.  The Court sustained the objection after a discussion with counsel:

> MS. MULLEN: In institutional reform litigation, the court-appointed
> officials, whether they're called a receiver, a master, et cetera, are paid by
> the agency they oversee.

> THE COURT: Correct.

> . . .

> MS. MULLEN: I've done a lot of institutional reform litigation, and I do
> not know of [one] instance in which the District of Columbia did not pay
> whoever the Court appointed. And that's just, it happens all over the nation.
> HUD paid him when he was in New Orleans.

> THE COURT: Right. This is a factor in the agency[] decision. It would be
> a factor, even if it turned out to not be determinative in any of the situations,
> it still a factor.

> MS. MULLEN: Yes, but it's not the factor, and it's not the type of factor
> that matters in a case such as this, because –

> THE COURT: They all matter in a case such as this. They all matter, and
> so the objection is sustained. Move on to your next question.

*Id.* at 57:25–59:10; *see also* May 26, 2017 Tr. [Dkt. # 267] at 172:3–16.

agency principles based upon the terms of the particular order that appointed him as well as any evidence of how it was implemented on a day to day basis.  The Court notes that defendant did get to put evidence in the record of how the order was carried out in practice through Gilmore.  *See, e.g.*, May 25, 2017 Tr. [Dkt. # 266] at 17:11–32:6.  Thus, the jury heard evidence advanced by both sides on this issue, and it made a factual finding that was amply supported by that evidence.

### C.    The Court did not improperly instruct the jury on the agency issue.

Turning to defendant's argument that the Court gave an improper jury instruction because it "refused to instruct the jury that 'control' was a key factor and 'the decisive test'" in determining whether Gilmore was an agent, Def.'s Reply at 9, the Court is not persuaded that there was a clear error that warrants relief.

Defendant initially proposed a jury instruction that said control is the "decisive test," citing a modified version of section 6.01 of the District of Columbia Standard Civil Jury Instructions:

> To decide whether Mr. Gilmore was an employee or agent of the District of Columbia, you must decide whether the District of Columbia had the right to control Mr. Gilmore's conduct. The decisive test is whether the employer has the right to control and direct the person's performance of his work and the manner in which the work is to be done. In this context, the right to control means the right to control the employee in the performance of a task and in its result and not the actual exercise of control or supervision. In analyzing an employer's right to control, we look to the actual relationship between the parties and the language of any agreement between them.

Ex. B3 to Parties' Second Am. Joint Pretrial Statement [Dkt. # 219-4] at 19.[8]

But the Court rejected that instruction, pointing to the legal authority it relied upon in denying defendant's motion for summary judgment.  *See* Mem. Op. & Order [Dkt. # 192] at 8.

---

8       The Court notes that the parties submitted multiple versions of their pretrial statement and proposed jury instructions, each failing to comport with the Court's instructions, until the final version was docketed on May 2, 2017.  *See* Joint Pretrial Statement [Dkt. # 212]; Joint Pretrial Statement [Dkt. # 213]; Parties' Am. Joint Pretrial Statement [Dkt. # 215]; Parties' Second Am. Joint Pretrial Statement [Dkt. # 219].

THE COURT: I've read this, all of those cases and I realize they all say in the ordinary situation[,] control is controlling and it's decisive.  But I believe that the case that I cited . . . in the summary judgment motion[9] – makes it clear that it depends on the circumstances.  And so I've got generally an agency relationship exists when one person or entity authorizes another to act on its behalf subject to its control.  But then it depends on the particular facts in each case.  And I don't think it's fair or a correct statement of the law, and you can disagree with me about this, but I don't plan to say control is decisive. . . . [A]s far as I'd be willing to go is to say . . . control is an important factor.

. . .

MS. MULLEN:  All right.  I was just quoting specifically from the standard civil jury instructions for the District of Columbia.

THE COURT:  I know.  I just don't think it applies in every situation, and I went through all of the annotations and wrestled with this for a long time, and I'm willing to be fair to the government and what their argument is.  But I don't think the law is that it's dispositive, and I'm not going to say that.  I do think there is plenty of case law which you have pointed to which fairly states that it's really important. . . .  So I will not say what you asked me to say, but I will emphasize the importance of control as an additional clause.

May 26, 2017 Tr. [Dkt. # 267] at 167:13–69:17.

The agency question was put to the jury with an instruction that included the following language:

Generally, an agency relationship exists when one person or entity authorizes another to act on its behalf, subject to its control, and the other agrees to do so.  Control is generally an important factor to consider.

But, whether an agency relationship exists in a given situation, though, depends upon the particular facts of each case.

In determining whether each plaintiff has proved that such a relationship exists here, you may consider all of the following factors:

1.  The selection and engagement of Mr. Gilmore;
2.  The payment of Mr. Gilmore's wages;
3.  The power of the District to discharge Mr. Gilmore;
4.  The power of the District to control Mr. Gilmore's conduct; and

---

9       *See Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982).

     5.   Whether Mr. Gilmore's work was part of the regular business of the District.

     In analyzing the right to control, you may consider the actual relationship between the parties and the language of any agreement between them.

Jury Instrs. [Dkt. # 249] at 38–40.

In its motion, the District is now challenging the Court's decision not to include the requested language that control is the "decisive" element. The Court is persuaded from its reading of the case law that its summary of the legal principles was correct, and defendant has provided the Court with nothing more than a one-sentence conclusory argument stating that the Court's instruction was incorrect. *See* Def.'s Reply at 9–10. This does not suggest that applying Rule 59 is appropriate.

"[T]he choice of the language to be used in a particular instruction . . . is reviewed only for abuse of discretion. The harmless error rule applies; to warrant reversal, the error must have been prejudicial:  It must have affected the outcome of the district court proceeding." *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009) (citation omitted). Even if the Court had instructed the jury exactly as requested by the District, there was sufficient evidence in the record – which the Court has already outlined in this ruling and its previous ruling on the Rule 50(b) motion – from which the jury could have reasonably determined that the District did control Gilmore's functions. Indeed, defendant has not even attempted to establish that the Court's failure to give the requested instruction affected the outcome of the trial.

Furthermore, the District did little to preserve its objection after the Court indicated how it intended to address the question of control. Counsel for the defense simply said "All right," *see* May 26, 2017 Tr. [Dkt. # 267] at 168:13, and after the Court elaborated further, counsel went on to the next issue without noting a continuing objection. *Id.* at 169:18–19. With respect to that next issue, by contrast, counsel for the District went to great pains to specify that she was

18

preserving the issue for appeal.  *Id.* at 169:18–71:24 (stating, for example, that she "checked with Appellate, and they told [her] to specifically address this in the jury instructions").

For all of these reasons, defendant's Rule 59 motion on this issue will be denied.

## II.    Admissibility of the Office of Inspector General Report

Next, the District argues that it was "unfairly prejudicial" to admit plaintiff's Exhibit 15, the Office of Inspector General ("OIG") Report, for two reasons:  (1) it was full of hearsay statements; and (2) because there was no evidence presented at trial that anyone at DOT knew of the communication between OIG and plaintiffs, the admission of the report "could have [led] a juror to conclude that other people would have known [about the alleged bribery] or treated the allegations more seriously given that the plaintiffs went to the OIG and the FBI."  Def.'s Mot. at 6–7.   The  record  reflects,  though,  that  the  Court  only  admitted  limited  excerpts  from  the report – those portions that recounted the fact that plaintiffs made a complaint to the OIG – and this was a permissible non-hearsay use of the material.  Moreover, the jury was instructed that the statements plaintiffs made to the investigators could only be considered for the fact that they were made, not for the truth of anything they said.  May 22, 2017 Tr. [Dkt. # 270] at 185:16–86:13.

At the pretrial conference, the defense objected to admitting Exhibit 15 in its entirety.  *See* May 10, 2017 Pretrial Conference Unofficial Tr. at 88:20–92:8 (discussing defendant's objection to the exhibit, and noting that the joint pretrial statement contains the parties' objections in writing); Parties Second Am. Joint Pretrial Statement [Dkt. # 219] at 21 (objecting to Exhibit 15 under Federal Rules of Evidence 401–403, 801, and 608).   The Court sustained defendant's objection to the bulk of the report.  May 10, 2017 Pretrial Conference Unofficial Tr. at 92:13–21 ("I believe I've granted the objection as, the overwhelming majority of it, as being irrelevant and hearsay, but permitting the few pages that corroborate the fact that plaintiffs made the report and

the date they made the report . . . ."); *see also* Fed. R. Evid. 801(c)(2) (defining hearsay as a statement "offer[ed] in evidence to prove the truth of the matter asserted").   The Court clarified that the report was only relevant to show that plaintiffs engaged in protected activity, but that anything else in it, "especially what [the investigator] concluded," is not "relevant to this case." May 10, 2017 Pretrial Conference Unofficial Tr. at 93:1–9.

Further, the Court ruled that only certain pages of the report would be admissible, and that the parties should work to redact all irrelevant information and hearsay statements.   After reviewing some of the proposed redactions, the Court informed plaintiffs that it believed that "there are aspects of what you sought to introduce that . . . still need to be redacted."   May 22, 2017 Tr. [Dkt. # 270] at 110:10–15.   It instructed the parties to redact repetitive paragraphs describing the general thrust of the investigation, *id.* at 111:8–12; *id.* at 117:1–19, and it directed that references to statements made to investigators by former plaintiff Marie Dorlus should be omitted unless they described a meeting in which plaintiff Saint-Jean or Bourciquot also participated.   *Id.* at 111:8– 13:22.

During the portion of the May 22 hearing where the parties and the Court discussed redactions to Exhibit 15, the District told the Court that it "still [had] deep concerns about this report being admitted."   May 22, 2017 Tr. [Dkt. # 270] at 125:17–21.   Counsel noted, for example, that page 1055 of the report contained "double hearsay" because it states that the "NYAT employees advised Clark and McNair . . . that Haitian bus drivers and bus attendants continue to render money to Smith in an effort to obtain hours of overtime."   *Id.* at 125:22–26:5.

But the Court reiterated that plaintiffs' statements to the OIG were admissible and relevant for the fact that they were made.   It observed that plaintiffs' report had "always been not just that we had to, but that others had to. . . .   Whether or not it's true is another matter.   But that's the

report, and that's the report that they say they got fired for making." May 22, 2017 Tr. [Dkt. # 270]

at 126:12–16. The Court confirmed that it would instruct the jury on the limited admissibility of

this sort of evidence: "[T]he first time they say so-and-so said X to me, I'm going to tell the jury

that that's only being admitted for the purpose of not whether it's true or not, but just the fact that

it was said to them." *Id.* at 127:13–16. And the Court emphasized that the report could "come in

because [plaintiffs] will be available. They're going to testify." *Id.* at 127:3–4; *see also id.* at

185:16–86:13 (instructing the jury on the limited admissibility of the report).

At the close of trial, the Court again reviewed the most recently redacted version of Exhibit

15. *See* May 30, 2017 Tr. [Dkt. # 271] at 111:1–20:25. Further discussions were had between the

Court and the parties about specific redactions, and then defense counsel placed its objection on

the record: "The defense – I just want to make my record here, Your Honor. The defense objected

to Exhibit 15 at the pretrial [conference] under 403 and 801." *Id.* at 112:20–22. Counsel went on:

> Exhibit 15 has never been redacted to the District's satisfaction. The exhibit
> is hearsay after hearsay after hearsay, repeated over and over again. And it
> is unduly prejudicial, particularly in light of the fact the Court would not
> permit, even though the plaintiffs did not object, for the jurors to know that
> at the conclusion of the report nothing came of it.

*Id.* at 113:3–9. The Court observed that this was "a completely new set of objections to an exhibit

that were not made at the pretrial conference," and reiterated that "[t]he exhibit is being admitted

for the sole purpose of the fact that the – that the [protected] disclosures were made, . . . [a]nd the

outcome of the investigation is irrelevant to whether [plaintiffs] were fired for making it." *Id.* at

113:11–19. But defendant persisted that, in its view, not enough was redacted from the report. *Id.*

at 114:2–15:19.

With regard to defendant's first argument, the OIG report was only admitted into evidence

after it was reviewed and heavily redacted by counsel and the Court to eliminate any irrelevant,

prejudicial, or hearsay statements. What was submitted to the jury included only the reports made

by plaintiffs to the investigators, which were admissible for the non-hearsay fact that they were made.  Moreover, both plaintiffs and Clark testified, and they were subject to cross-examination, and the jury was told how the evidence could be considered.  *See* May 22, 2017 Tr. [Dkt. # 270] at 185:16–86:13 (instructing the jury that testimony about what plaintiffs told investigators is "being admitted for the purpose of the fact that [the investigators] heard it and whatever impact it had on them," but that the jury "can't take it as evidence that just because somebody said it to them, it was true").

Further, the fact that the report was only admitted into evidence to support plaintiffs' contentions that they engaged in protected activity cuts against defendant's second argument that the report "could have [led] a juror to conclude that other people would have known [about the alleged bribery] or treated the allegations more seriously given that the plaintiffs went to the OIG and the FBI."  Def.'s Mot. at 6–7.  This vague objection does not establish that the probative value of the evidence was "substantially outweighed" by a danger of unfair prejudice or misleading the jury, *see* Fed. R. Evid. 403, and defendant was fully able to introduce evidence and then argue in closing that plaintiffs' supervisors were unaware of plaintiffs' report to the OIG.  The Court granted defendant's Rule 50 motion for judgment notwithstanding the verdict on the Title VII count for just that reason.  *See* Nov. 27, 2017 Unofficial Tr. at 6:20–12:1.

Therefore, defendant's motion on this issue will be denied as well.

## III.   Cautionary Instructions on Hearsay

The District does not contest the fact that the jury was properly instructed about the limited purpose for which plaintiffs' testimony about statements allegedly made by other Haitians were admitted.  *See generally* Def.'s Mot; Def.'s Reply; *see also* May 22, 2017 Tr. [Dkt. # 270] at 185:16–86:13 (instructing the jury on the limited purpose of these statements).  But it argues that

the Court committed error by not reminding the jury of hearsay's "permissible use" after closing argument.  Def.'s Reply at 12.[10]

During Teddy Clark's direct examination on May 22, 2017, the Court determined that this would be "the most important, opportune time" to give an instruction about hearsay, and to remind the jury that any evidence of out of court statements allegedly made by other Haitians that were referenced in the OIG report, or described by plaintiffs or Clark, were being admitted not for the truth of the statements, but for the fact that plaintiffs heard them.  *See* May 22, 2017 Tr. [Dkt. # 270] at 183:7–14.

The Court gave the following instruction:

> All right.  Now, you're going to – you've heard some testimony, members of the jury, and you may hear more where you're going to hear that Ms. Saint-Jean or Ms. Bourciquot or Ms. Dorlus are either going to tell you or that they told this investigator that somebody else told them something. And if that testimony is admitted, it's being admitted for the purpose of the fact that they heard it and whatever impact it had on them.
>
> But you can't take it as evidence that just because someone said it to them, it was true . . . unless whoever said it to them comes in and testifies about whether it's true or not.  But sometimes you are allowed to put in evidence of something that somebody said to a witness just for the fact that the witness heard it, because that might be an important fact to why the witness did what the witness did or why the witness thought what the witness thought.
>
> But the evidence about what any other Haitian employees told the plaintiffs about what they were doing is only being admitted for the purpose[] of the fact that it was said to the plaintiffs and what the plaintiffs thought about it, and not for the fact of whether or not it was true.  You can only consider it for that limited purpose.

*Id.* at 185:16–86:13.

---

10      Plaintiff argues, and defendant denies, that defendant only raised this argument in its reply brief and that it is therefore untimely.  *See* Pl.'s Sur-reply at 3, 13–14; Def.'s Resp. to Pl.'s Sur-reply at 5.  But again, the Court will address it since the parties have had an opportunity to brief the issue.

At the end of the trial, prior to closing arguments, the defense requested that the Court give another instruction, "as Your Honor did in [plaintiffs'] case in chief," that the statements from other Haitians to plaintiffs were not being admitted for their truth because defendant presumed there would be "references" to those statements in closing arguments.   May 30, 2017 Tr. [Dkt. # 271] at 47:20–48:2.   The Court told counsel, "we'll see if it's necessary after closing," *id.* at 48:3–4, to which counsel said, "All right.  Thank you."  *Id.* at 48:5.

After closing arguments, the District did not renew its request for another hearsay instruction.  And defendant does not contend that it did.  Therefore, the District has waived this argument.  In any event, plaintiff did not make any reference to statements allegedly made by others to plaintiffs during closing argument.  *See* May 30, 2017 Tr. [Dkt. # 271] at 54:22–75:11.

## IV.   Temporal Proximity

Defendant argues that the Court should have instructed the jury that temporal proximity standing alone is insufficient to prove retaliation.  Def.'s Mot. at 7–8.  Although the heading at the start of defendant's argument in its brief seems to take issue with a jury instruction, *see id.* at 7 ("The Court should have instructed the jury that temporal proximity standing alone is insufficient to prove retaliation."), defendant never identifies any problematic jury instruction that was given, or a proposed jury instruction that was improperly excluded.  Rather, it submits that there was no evidence that Michelle Smith or Michael Roberts knew why plaintiff Saint-Jean met with Gilmore on July 18, 2008,[11] and that without such evidence, no juror could have found retaliatory intent and causation.  *Id.* at 7–8.

But the Court fully addressed the question of the sufficiency of the evidence of causation when it ruled on defendant's Rule 50(b) motion.

---

11      Defendant cites to July 18, 2007, but the referenced meeting took place in 2008.

As the Court found at that time, there was no evidence that the complaints made to the Mayor's office, the OIG, or the FBI in November and December of 2007 about discrimination against Haitians and about kickbacks related to overtime were known to any of the supervisors or decision makers who recommended disciplinary action.  However, there was evidence that they were aware of other conversations and complaints made by plaintiffs concerning overtime, as well as evidence that Smith was indeed aware that plaintiff Saint-Jean had been to see Gilmore.

Plaintiff Saint-Jean testified that she discussed overtime with Smith in early July 2008 and that she and Bourciquot immediately received an onslaught of warnings and reprimands.  *See* May 23, 2017 Tr. [Dkt. # 261] at 66:5–67:23; *see id.* at 69:23–76:19 (describing reprimands).  Plaintiff Bourciquot testified that she told her supervisor, Janice Waters, in early March 2008 that she "can't get some overtime because [she was] not paying Ms. Smith."  May 24, 2017 Tr. [Dkt. # 265] at 28:16–20.  Bourciquot was suspended by Waters that day.  *Id.* at 28:22–29:16.

Plaintiff Saint-Jean also testified that Smith saw her at Gilmore's office on July 18, 2008, the day she was called in to be questioned about overtime issues.  *See* May 23, 2017 Tr. [Dkt. # 261] at 82:22–83:10 (testifying that she saw Smith and they made "eye contact" at Penn Center on July 18, 2008 when she went with Dorlus and Bourciquot to meet with Gilmore).  This was sufficient evidence from which a jury could infer that Smith knew or suspected that Saint-Jean had complained to Gilmore's office about the kickback scheme.

Further, there was evidence to support an inference that certain actions were taken at the direction of employees with knowledge of those complaints, including Smith.  For example, Saint-Jean was fired after she complained that her route had been taken away from her and she refused to do a shorter one.  *See* May 23, 2017 Tr. [Dkt. # 261] at 92:20–96:24.  Plaintiff Saint-Jean testified that Joe Jones, one of her supervisors, told her that he took the route away from her

because "I have a boss" – meaning Smith. *Id.* at 94:11–16 ("Q.  Did Mr. Jones give any indication to you as to why he wasn't allowing you to do your route? . . . A. He said – he said to me, yeah, we took the route because I have a boss.  Q:  Okay.  And who was his boss at this point in time?  A.  Miss Smith.").

Finally, defendant ignores the critical fact that Gilmore, the ultimate decision maker at DOT, was plainly aware of the allegations made to him.  Saint-Jean and Bourciquot reported telling Gilmore about favoritism in the allocation of overtime.  *See* May 23, 2017 Tr. [Dkt. # 261] at 80:5–81:10; May 24, 2017 Tr. [Dkt. # 265] at 30:25–32:15 (testifying that they met with Gilmore in July to explain that they "can't get any overtime"; "they have their favorite people, they can give them overtime, not us").  The next day, Gilmore summoned Saint-Jean to his office to discuss the kickback issue, and he also asked her if she was the one who wrote an anonymous email complaining about the need to pay supervisors to get overtime.  May 23, 2017 Tr. [Dkt. # 261] at 82:1–84:9.  So there is evidence that Gilmore knew of plaintiffs' complaints, and the jury could have been troubled by Gilmore's fingerprints on many of the adverse actions in this case.

The bottom line is that the record included more than just evidence of temporal proximity.

But even if defendant's motion is predicated on the sufficiency of the jury instructions, the Court finds no reason to alter the judgment since defendant has provided the Court with no legal reason to do so.[12]

Defendant did not propose a jury instruction in the pre-trial statement saying that temporal proximity alone is not enough.   *See* Ex. B3 to Parties' Second Am. Joint Pretrial Statement [Dkt. # 219-4] at 31 (providing a proposed instruction titled "Proof of Retaliation," which did not mention temporal proximity).

Prior to the jury instruction conference, the Court gave the parties the following instruction for review with regard to the FLSA:

> For the third element, each plaintiff must prove by a preponderance of the evidence that there was a "causal connection" between the protected activity and the materially adverse action. This means that she must prove that the defendant took the action because she engaged in a protected activity under the Fair Labor Standards Act. The plaintiffs are not required to prove that the protected activity was the only reason behind the employer's action, but each must prove that the defendant would not have taken the materially adverse action in the absence of, or "but for" the protected activity.

---

12      It is unclear if defendant is challenging the portion of the instruction that discusses the employer's knowledge as well.  If that is the portion being challenged, then the District has likely waived that argument.  During the jury instruction conference, defense counsel said:  "The other concern I have is that causation, the defendants had to know that there was protected activity, and there doesn't seem to be – I haven't seen anything in the instructions that say the employer has to know that the protected activity occurred."  May 26, 2017 Tr. [Dkt. # 267] at 152:10–15.  The Court pointed out that there was an instruction allowing the jury to "consider whether plaintiffs have produced evidence to show that any individuals alleged to have acted with retaliatory intent had knowledge," *id.* at 152:16–20, and defense counsel said, "I saw that one."  *Id.* at 152:21.  The District then argued that it was an element of plaintiffs' case to prove that defendants knew of the protected activity.  *Id.* at 153:6–54:15.  The Court acknowledged that it "wrestled with" the knowledge requirement but ultimately could not find any legal support for requiring plaintiffs to prove knowledge as an element of their case.  *Id.* at 153:13–54:21.  The Court gave defendant the opportunity to supply the Court with a different instruction and a legal source.  *Id.* at 154:16–55:13 ("But if you want me to say in order to prove your case, to prove causation, you must show knowledge, then I want to see the language and I want to see the citation.").  The District stated it would do so, but it never filed any subsequent instruction with the Court.

> One factor that may be considered when evaluating whether protected activity was the cause of a retaliatory action can be the closeness in time between the protected activity and the alleged act of retaliation.

Draft Jury Instrs. (emailed to counsel on May 25, 2017).[13]

At the jury instruction conference, the defense requested for the first time that the following language be added:  "But temporal proximity between the protected activity and alleged act of retaliation standing alone does not prove that retaliation occurred."  May 26, 2017 Tr. [Dkt. # 267] at 150:15–23 ("We'd like an addition to that instruction, Your Honor.").  Counsel agreed that temporal proximity is "one thing that you can consider in deciding whether retaliation took place." *Id.* at 151:3–7.  But she said that she did not believe "the case law supports that temporal proximity, just temporal proximity without anything else . . ., proves retaliation."  *Id.* at 151:3–5.  No particular case was cited, however.

The Court questioned what it would mean to have temporal proximity "standing alone," and it asked whether temporal proximity could be sufficient circumstantial evidence of retaliation to make out a prima facie case when it was combined with an employer's knowledge of a protected activity.  May 26, 2017 Tr. [Dkt. # 267] at 151:8–25.  The Court then suggested placing the

---

13    The Court gave an almost identical proposed instruction with regard to Title VII:

> For the third element, each plaintiff must prove by a preponderance of the evidence that there was a "causal connection" between the protected activity and the materially adverse action. This means that she must prove that DOT took the action because she engaged in a protected activity under Title VII. The plaintiffs are not required to prove that the protected activity was the only reason behind the employer's action, but each must prove that DOT would not have taken the materially adverse action in the absence of, or "but for," the protected activity. One factor that may be considered when evaluating whether protected activity was the cause of a retaliatory action can be the closeness in time between the protected activity and the alleged act of retaliation.

Draft Jury Instrs. (emailed to counsel on May 25, 2017).  Because the Court granted defendant's Rule 50(b) motion as to the Title VII count, it will focus on the FLSA jury instructions.

sentence about temporal proximity, as written, right before the instruction about retaliatory intent, *id.* at 152:2–9, to which defense counsel said, "I think it might be better" there. *Id.* at 152:10.[14] To the extent the District remained unsatisfied with the revised instruction, at least in relation to the temporal proximity language, it made no further objection for the record.

      The Court sees no error here. Defendant has not pointed to any case law that would have required the Court to instruct the jury in accordance with defendant's proposal. The Court made

---

14    Thus, the final FLSA instruction read:

> For the third element, each plaintiff must prove by a preponderance of the evidence that there was a "causal connection" between the protected activity and the materially adverse action. This means that she must prove that the defendant took the action because she engaged in a protected activity under the Fair Labor Standards Act. The plaintiffs are not required to prove that the protected activity was the only reason behind the employer's action, but each must prove that the defendant would not have taken the materially adverse action in the absence of, or "but for" the protected activity.

> One factor that may be considered when evaluating whether protected activity was the cause of a retaliatory action can be the closeness in time between the protected activity and the alleged act of retaliation.

> In addition, to succeed on a retaliation claim, each plaintiff must prove that she was intentionally retaliated against because she engaged in protected activity. An act is intentional if it is done voluntarily and not by mistake.

> Retaliatory intent may be proved either by direct evidence, such as statements made by a person whose intent is at issue, or by circumstantial evidence from which you can infer a person's intent. In making a determination as to whether there was intentional retaliation in this case, you may consider any statement made or act done or omitted by a person or more than one persons whose intent is in issue, as well as all other facts and circumstances that indicate his or her state of mind.

> When considering this question, you may consider whether plaintiffs have produced evidence to show that any individuals alleged to have acted with retaliatory intent had knowledge of plaintiffs' protected activity. You may also consider whether you find the reasons stated for taking any adverse action to be credible.

Jury Instrs. [Dkt. # 249] at 30–31.

it clear that plaintiffs had to satisfy the "but for" test to prove retaliation, and while it correctly told the jury that temporal proximity was a factor it could consider in connection with causation, it also emphasized the need for a showing of retaliatory intent. So the instruction did not invite a finding based on temporal proximity "alone."

Moreover, defendant has not demonstrated that the outcome of the trial would have changed with a different instruction, *see Czekalski*, 589 F.3d at 453, so the Court sees no reason to order a new trial or alter the judgment.

## CONCLUSION

For all of the foregoing reasons, defendant's motion for a new trial, or to alter or amend the judgment [Dkt. # 303] is DENIED.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE:  June 14, 2018